MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Respondent, v ROBERT E. TATE, Appellant.

Second Department, February 22, 1977

*Peter J. Byrnes* for appellant.

*Post, Hopkins & DeMott (David R. Crow* of counsel), for respondent.

SHAPIRO, J. On February 1, 1972 plaintiff issued a $25,000 insurance policy on the life of Patricia B. Tate in which her husband, the defendant here, was named as beneficiary. She died of pneumonia 23 months later. When the defendant demanded payment under the policy, the plaintiff made an investigation in which it learned that Mrs. Tate, in her application for the policy, had omitted the name of a psychiatrist whom she had seen. It thereupon commenced this action to rescind the policy. The defendant counterclaimed and demanded payment of the face amount of the policy. The court,

after a nonjury trial, rendered judgment in favor of the plaintiff. We reverse and grant judgment to the defendant.

The basis of the plaintiff's right to rescind is predicated upon its contention that, if it had been given the withheld information, it would have refused to issue the policy. In its complaint the plaintiff alleged that, at the time the policy was issued, Mrs. Tate suffered from alcoholic addiction, including a mental condition, and that she had "consulted a physician or other practitioner for reasons not mentioned in the * * * application."

In her application for insurance, dated January 31, 1972, decedent did not include the name of a Dr. Ferrell (a psychiatrist) in her "yes" answer to the question, "During the past ten years have you had (A) Advice from or attendance or treatment by physicians, other practitioners or psychologists?" In addition, decedent answered "no" to the questions which asked whether she had, during the past 10 years, been treated "for drug or liquor usage" and whether she had "at any time * * * had any known indication of or been told that * * * [she] had * * * apoplexy, epilepsy, mental illness, nervous breakdown or any disorder of the brain or nervous system?" She did, however, disclose, in answer to another question on the application, that she had, within three years, had "a physical or health examination" by a "Dr. F. Fry, Garden City, N.Y."

What the record establishes is that decedent, during a maternity leave from teaching school, told her husband that she wanted a divorce. He, in turn, told this to his friend, Dr. Ferrell. The doctor offered to consult with Mr. and Mrs. Tate to see if he could be of some help in effecting a reconciliation. The visits, some 10 in number, took place between November, 1969 and May, 1970. Decedent was reluctant to go and Dr. Ferrell testified that he did not know why decedent came to see him. Defendant's testimony on this point was that decedent agreed to the consultations on the representation that, if nothing was resolved after the visits, he would not contest a divorce. (A divorce action was never instituted and, apparently, Mrs. Tate returned to her teaching position in September, 1971.)

Dr. Ferrell had no notes on the visits, after the first two. His records do not even indicate, for three of the visits, which of the Tates was present, or whether they both were. He had no written diagnosis, nor had he otherwise formulated a

definite diagnosis. He had an idea, first voiced at the trial, that perhaps the difficulties between the parties came about because of a possibility that Mrs. Tate was suffering from postpartum depression. However, what his notes recorded was that Mrs. Tate felt that her husband had been critical of her for six or seven years, that he was a loud and domineering man who would not get rid of the dog, and that there was a "lack of sex" and a "lack of communication." His notes also bore the following notations: "No screaming. No criticism. Try to improve the sex life. Make an agreement on money. Decrease drinking." These, thought the doctor, were recommendations he likely made to both of the Tates.

The word "alcoholism" was also noted in the doctor's records. The doctor did not know whether he or one of the Tates had used that word. If the latter, he did not know which.

Sometime in March or April, 1972 decedent was hospitalized. (The date is indefinite because the hospital record, having been made after the date of the application for insurance, was excluded from evidence.) At that time Dr. Ferrell attended the insured. On May 13, 1972 he recorded the fact that the insured was suffering from involutional melancholia. According to his testimony, that was the first occasion on which he made a definite diagnosis that Mrs. Tate was suffering from melancholia, but it is remarkable to note that nowhere in his testimony did he ever medically define that term. (In Webster's Third New International Unabridged Dictionary, that term is defined as "a disordered mental condition characterized by extreme depression of spirits, bodily complaints, and often hallucinations and delusions".)

To establish the materiality of the omission of Dr. Ferrell's name in the insurance application, the plaintiff's associate medical director testified that "the general course of [plaintiff's] business" is to make inquiry if an applicant lists a psychiatrist and that no action is taken on the application until a statement from the physician is received and a definite diagnosis is made. Involutional melancholia, he said, is listed in plaintiff's underwriting manual as a serious psychosis. He also testified that either a psychosis or the use of alcoholic beverages at a certain level makes a policy, at the least, ratable, if not rejectable.

The Trial Justice determined that the plaintiff had proved a material misrepresentation as a matter of law. I disagree because the plaintiff utterly failed to prove that it was de-

prived of information on the date the policy issued which, if disclosed, would have led to a refusal of the policy since the record contains no credible proof that Dr. Ferrell had diagnosed or treated the insured for either involutional melancholia or alcohol addiction.

A misrepresentation in an application for insurance is material if knowledge by the insurer of the facts misrepresented would have led to a refusal of the policy (Insurance Law, § 149, subd 2). A failure to disclose is as much a misrepresentation as a false affirmative statement *(Geer v Union Mut. Life Ins. Co.,* 273 NY 261). For the purpose of determining materiality, the fact that an applicant failed to understand the significance of the omission is irrelevant *(Leamy v Berkshire Life Ins. Co.,* 39 NY2d 271, 274).

"If an applicant misrepresents that he has not had 'previous medical treatment, consultation or observation' [Insurance Law, § 149, subd. 4], he is then deemed to have represented that he has not had the disease, ailment or other medical impairment for which such treatment or care was given or which was discovered by any licensed practitioner as a result of such consultation or observation" *(Tolar v Metropolitan Life Ins. Co.,* 297 NY 441, 447; accord *Leamy v Berkshire Life Ins. Co., supra; Process Plants Corp. v Beneficial Nat. Life Ins. Co.,* 53 AD2d 214).

Thus, in order to be successful in its claim for rescission, plaintiff was required to establish its contention that, at the time the policy was issued, Dr. Ferrell, who described himself as a "sort of general psychiatrist" without a specialty, had previously treated the decedent for "a mental condition" or "alcoholic addiction". It proved neither, for the testimony of the doctor did not establish treatment or diagnosis of either condition. To understand the purport of his testimony, a few extracts therefrom are most enlightening.

Referring to his records (which, to say the least, were incomplete and confusing), he testified that he first saw Mrs. Tate with Mr. Tate on November 17, 1969. Mrs. Tate "had been disappointed for sixteen years" that she did not have a child (which she then had). She felt that Mr. Tate had been critical of her for six or seven years, beginning in 1962, and that he was a loud and domineering man who "wouldn't get rid of the dog." There was a "lack of sex" and a "lack of communication". She had asked *him* to see a psychiatrist the year before. *The witness did not know what the notation*

*"alcoholism"* in his records meant, "whether she [Mrs. Tate] was describing him [Mr. Tate] or whether he was describing her. I don't have it noted." *He did not know who used the word,* i.e., he, himself, or the Tates. Mrs. Tate was talking in Mr. Tate's presence. He does not know how long the interview lasted. There is a notation in his records about Dr. Fry and he thought that he had asked Mrs. Tate to ask Dr. Fry to send "a report of her physical condition".

It was agreed among the three of them that there would be "further consultations". On November 20, 1969 the witness saw Mrs. Tate alone. The word "coffee" appears in his records, but he does not know the significance of it. Mrs. Tate spoke of the lack of affection "from Mr. Tate to Mrs. Tate." Then he, Dr. Ferrell, trying to help "these people * * * to reconcile themselves," had notations of recommendations he likely made: "No screaming. No criticism. Try to improve the sex life. Make an agreement on money. Decrease drinking." The recommendations applied to *both;* he probably communicated them to Mr. Tate by telephone. He also had notations for that date of "compromise", "leave running of home to me", "courtesy to family and tolerance", "file and pay taxes", and "pay bills". The witness indicated what he thought the notations stood for.

On November 22, 1969 he had an office visit with Mr. Tate, with nothing else recorded. On November 25, 1969 he saw Mrs. Tate; he made no "memos on that meeting."

On December 8, 1969 and on January 15, 1970 he saw Mrs. Tate. He has no notes on either visit. On February 2, 1970 and March 30, 1970 he saw both Mr. and Mrs. Tate, but he has no notes. On April 6, 1970 he saw *either* Mr. or Mrs. Tate; he "would suspect" it was Mrs. Tate, but he has no notes and no other notation on his records. For April 27, 1970, once more his notes do not indicate which of the Tates, or both, he saw; the same is true for a visit listed for May 11, 1970.

He next saw Mrs. Tate in March or April, 1972 in the hospital; *this was after the date of the subject application.* The hospital records show that he made a diagnosis of Mrs. Tate *on May 13, 1972. It is the first diagnosis the witness recorded.* Then, still on direct examination, he testified:

Q Had you made a diagnosis prior to that?
A In a hospital or in my office or in any other forum, no, sir.
Q That is the only date appearing in your records, is the diagnosis date, is that right?

A  That's right.

Q  *Had you made a diagnosis and not placed it in your records?* * * *

A  *Yes, I think I had.*

Q  Can you give me that diagnosis that you did not put in your records and when did you make it?

A  *I think it is the same one I put in my records.*

Q  *When did you first make the diagnosis, before January 31, 1972 or after January 31, 1972?*

A  *I don't remember.*

Q  You had ten meetings with Mrs. Tate, sometimes Mr. Tate was present, beginning in 1969 and in 1970. During all that time, Doctor, *didn't you have an idea what the condition was that you had found existed, if any, in Mrs. Tate?*

A  I had some *idea,* yes, sir.

Q  *And what was that idea?*

A  *I considered her to be involutional melancholia with a postpartum depression.* * * *

Q  *When did you come to that conclusion, Doctor?*

A  Well, I think this came about as the story developed.

Q  But when did you come to that conclusion?

A  *I don't remember, counselor.*

Q  *Did you come to that conclusion before January 31, 1972?*

A  *I can't answer that.*

Q  You had ten meetings with her in 1969 and 1970. *Did you come to any conclusion as a result of those meetings?*

A  *Yes.*

Q  *What was that conclusion?*

A  *That she was suffering from this type of illness that I have just described.*

Q  *And that was before January 31, 1972 when the ten meetings had been held?* [As of January 31, 1972 there had been five meetings; on February 2, 1972 there was another with both of the Tates.]

A  *I don't know.*

Q  Did you have occasion at any time *to change your opinion?*

A  *Yes.*

Q  *When?*

A  *I would say sometime perhaps between July, perhaps, and September '72.*

Q  July and September of '72?

A  I am guessing, yes.

Q  *But not before January 31, 1972, is that right?*

A  *That's right* (emphasis supplied).

After some colloquy, still on direct examination, Dr. Ferrell testified:

Q  As a result of your conferences * * * in 1969 and 1970 with Mrs. Tate, had you formed an opinion or a conclusion with regard to her condition?

A  *I am not sure.*

Q  When did you form an opinion with regard to her condition?

A  *5/13/72* (emphasis supplied).

Apparently feeling that the plaintiff was experiencing diffi-

culty with the witness, the court elicited the following testimony:

Q Doctor, did you form an opinion prior to May 13, 1972?

A Yes, your Honor, I think we all form opinions trying to grasp what is the meaning of this problem before us, and we come to all sorts of conclusions.

Q Did you form an opinion prior to January 31, 1972?

A I am certain I formed numerous opinions.

Q Can you tell us generally when you formed your last opinion prior to January 31, 1972?

A Can I tell you when?

Q Approximately.

A *No, sir.*

Q You cannot?

A I think it is an ongoing thing, it is part of developing the diagnosis, a working hypothesis that you work into, you hear this and you hear that, you take this into consideration and you do this and you do that, and say oh, that fits; oh, no, it doesn't. Then you readjust it, and so forth. Then along comes an insurance form. All right, you have to put something down, so you put all of this together and you try to make it as logical as possible to fit the facts as you understand them and you can back them up reasonably well * * *

Q Doctor, after the meeting on May 11, 1970 [at which he may have seen ·Mrs. Tate], in your opinion does involutional melancholia exist as an ailment or trouble of Mrs. Tate?

A I think it covers part of her illness.

Q Was part of her illness then postpartum depression?

A Yes, I think it was.

Q *This was on May 11, 1970 * * *?*

A *I don't know about that. I can't say. The only evidence I have here is 5/13/72 that I can say,* this I said, this I did; this is all I got. *All else is mumbo-jumbo which I can theorize about, I can give you hundreds of opinions as to this woman's condition.*

Q But after the meeting on May 11, 1970, is it fair to say that in your opinion she had involutional melancholia?

A *I don't know.* That is an opinion and I am not reaching that opinion in this court at this time. * * *

Q Had you formed an opinion?

A I formed a number of opinions.

Q Recite the opinions * * *.

THE COURT: Yes * * * any opinions that you had *prior to January 31, 1972* * * * if you had any.

A *Marital maladjustment.* This isn't diagnosis but it is a paranoid ideation.

Q How about postpartum depression?

A Yes, this was one of the first things that stuck out in your mind, because she had the child and then this problem. * * * [T]here were a lot of conflicting ideas from Mr. and Mrs. Tate, and so you form one opinion, one says this and one says that * * * and you hear this and you hear that, and finally you get some data and you think, well, now, this begins to make sense to me. * * *

But here it was, apparently two immature individuals arguing about

something, and I am supposed to know what is the truth. What about the dog? I don't know anything about the dog. All this is hearsay * * * Yack, yack, yack, yack. And I am sitting there trying to resolve this, trying to make sense out of all this nonsense * * * And then it comes time, I present a measly bill for some money and I write down involutional melancholia. That is not something that will stand up in court. This is to collect some kind of—I don't know what it is.

Q Doctor, what is paranoid ideation?

A Being overly suspicious, accusatory, being overly concerned with sexual matters of another individual. *I don't know whether these things are true. These were repeated in my office.*

Q And what is marital maladjustment?

A Marital maladjustment, that is what took place in my office. * * *

Q *Doctor, did you have an opinion on or before May 11, 1970 of involutional melancholia?*

A *I don't recall.* I possibly did, because I tried to form everything that I could think of to put this into a psychiatric picture, besides just a family fight.

Q And did you have an opinion—

A *I think if I called it a family fight, that would describe it.*

Q And during the same period did you have an opinion that postpartum depression existed? * * *

A *I may have. I don't recall.*

Q And did you have an opinion of paranoid ideation on or before May 11, 1970?

A I would certainly think I would think of that as one of the first things that would hit my office * * * here is a woman that seems overly suspicious. What do you think of when you think of suspicion? You think of paranoia. This is normal (emphasis supplied).

On cross-examination Dr. Ferrell testified, among other things, that he was a friend of the defendant's; that they had met "in a legal matter"; that he had visited the Tate home and socialized with the defendant at other places; that the defendant told him his wife was retaining a lawyer to obtain a divorce and that the witness indicated he could perhaps be of some help to them both; that he did not bill the Tates for his services because he was returning a professional courtesy; that Mrs. Tate did not consider herself his patient; and that he did not "know exactly why she came." His treatment consisted, in part, of "trying to ascertain what strengths Mrs. Tate had, what her job was, how she was working at that, what her physical condition was * * * all of these things were building up to the point of assisting her if she wished to obtain more security, more happiness, alleviation of her symptoms, and so on." Marital difficulties, he testified, are "just one facet of a human relationship problem or an interpersonal problem." He prescribed no medication, nor did he hospitalize Mrs. Tate in 1969 or in 1970.

The defendant Robert Tate was the sole witness on his own

behalf. He testified that he took his wife to see Dr. Ferrell in 1969, when his wife consulted an attorney about a divorce. Their son was about 14 months old and the defendant wanted to save the marriage. He discussed the matter with his friend, Dr. Ferrell, who suggested that the witness come in and "bring Patty". He estimated that he saw Dr. Ferrell alone on three to five occasions. Dr. Ferrell conversed with him about "how we could conduct our lives in a more harmonious fashion with a view of staying married"; the witness recalled no specific advice. He did not consider Dr. Ferrell to be his psychiatrist. His wife objected to going. She felt that "Dr. Ferrell was a social and professional friend of mine"; her consent issued "on the representation that if in fact we could not rehabilitate our marriage within a six-month period, I would not contest a divorce action".

The only question on cross-examination was whether the defendant had been served in this action.

At the trial plaintiff argued that if the applicant had included the name of the psychiatrist inquiry would have been made but such an omission in an insurance application is not, per se, material (see, e.g., *Jenkins v John Hancock Mut. Life Ins. Co.,* 257 NY 289, 293, a case which predates present section 149 of the Insurance Law). Materiality is grounded on what the undisclosed information would have revealed (see *Vander Veer v Continental Cas. Co.,* 34 NY2d 50; *Tolar v Metropolitan Life Ins. Co.,* 297 NY 441, *supra).* In this case the nexus between the omission and the refusal to issue the policy, i.e., the materiality of the omission, is not provable by conjecture. The ideas, the working hypothesis that Dr. Ferrell purportedly had, even assuming that at the time in question the decedent and he had a patient-physician relationship, which is not at all clear, are just that, conjectural and speculative.

An insurer does not satisfy its burden by stating that it would have inquired further. It is what the omitted inquiry would have revealed that is critical and, on this record, the testimony of Dr. Ferrell, upon which the plaintiff's right to relief depends, is that on May 13, 1972, months after the insurance policy was issued, he came to the conclusion that Mrs. Tate was then suffering from postpartum depression, that "all else is mumbo-jumbo which I can theorize about, I can give you hundreds of opinions as to this woman's condition", that "I write down involutional melancholia" but "[t]hat

is not something that will stand up in court", that she was suffering from "marital maladjustment, that is what took place in my office" and that "I think if I called it a family fight that would describe it."

The determination of the court in authorizing a rescission of the policy, as a matter of law, on that testimony, was erroneous and, even if the court had decided in favor of the plaintiff as a question of fact, such a determination would have been contrary to the weight of the evidence. Accordingly, since this was a nonjury trial, the judgment in favor of plaintiff should not only be reversed on the ground that plaintiff did not sustain the burden of factually proving its case, but judgment should be directed for the defendant on his counterclaim (see *Bernardine v City of New York,* 294 NY 361, 366-367).

HOPKINS, Acting P. J. (dissenting). I dissent and vote to affirm the judgment.

Special Term found that the decedent failed to disclose that she had received "advice from or attendance or treatment by physicians, other practitioners or psychologists", as requested by the application form for the insurance. Special Term further found that Dr. Ferrell, a psychiatrist, diagnosed the condition of the insured as "involutional melancholia with post-partum depression" and "paranoid ideation", and that he had treated the insured for alcohol addiction. Special Term also found that the policy would not have been issued had the plaintiff known that the insured had consulted Dr. Ferrell concerning her condition or that the insured had been treated by a psychiatrist.

Clearly, if the record supports these findings, Special Term was justified in granting judgment rescinding the policy because of the material misrepresentation by the insured in the application (see Insurance Law, § 142, subd 3; § 149; *Geer v Union Mut. Life Ins. Co.,* 273 NY 261). It is not relevant that the decedent did not understand the significance of the questions and her answers (see *Leamy v Berkshire Life Ins. Co.,* 39 NY2d 271, 274). Moreover, the plaintiff is entitled to determine what risks it will accept for insurance (see *Vander Veer v Continental Cas. Co.,* 34 NY2d 50, 52).

The majority rests the reversal on the conclusion that the testimony of Dr. Ferrell did not establish that he had treated the decedent for a psychiatric disorder or alcoholic addiction.

The credibility of Dr. Ferrell, in view of his friendship with the decedent and her husband (the defendant), and his evident reluctance to damage the defendant's case, was of course a matter primarily for the trial court to decide. A reading of the testimony, in my opinion, validates the findings made after the trial that Dr. Ferrell did indeed treat the decedent for a psychiatric disorder and alcoholic addiction. It is not decisive that the cause of death was not related to the condition diagnosed by Dr. Ferrell. "The fact that the applicant died from another cause does not disprove the increase of risk" (see *Glickman v New York Life Ins. Co.,* 291 NY 45, 52; see, also, *Vander Veer v Continental Cas. Co.,* 34 NY2d 50, *supra; Hollinger v Mutual Benefit Life Ins. Co.,* 541 P2d 128 [Col]; *Vaughn v American Nat. Ins. Co.,* 543 P2d 1404 [Okl]; Ann 148 ALR 912).

Essentially, therefore, the judgment of Special Term was based upon findings of fact, supported by sufficient evidence, and we should not substitute our judgment to reach an opposite result (see *Barrett v State Mut. Life Assur. Co.,* 49 AD2d 856; *Orenstein v Metropolitan Life Ins. Co.,* 18 AD2d 1016; cf. *Tolar v Metropolitan Life Ins. Co.,* 297 NY 441, 446-447).

DAMIANI, RABIN and TITONE, JJ., concur with SHAPIRO, J.; HOPKINS, Acting P. J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Nassau County, entered November 10, 1975, reversed, on the law and the facts, with costs, defendant is awarded judgment on his counterclaim, and action remitted to Special Term for entry of an appropriate judgment.