# L. SMIRLOCK REALTY CORP., Appellant, v TITLE GUARANTEE COMPANY, Respondent.

Second Department, November 5, 1979

456

APPEARANCES OF COUNSEL

*Meyer, English, Cianciulli & Peirez, P. C. (Jeffrey G. Stark* of counsel), for appellant.

*Permut, Ashare, Boyle & Russo (John J. Boyle* and *Michael Permut* of counsel), for respondent.

**OPINION OF THE COURT**

Lazer, J.

■ In this action to recover on a policy of title insurance and for negligence, plaintiff appeals from a judgment of the Supreme Court, Nassau County, which, after a nonjury trial, dismissed its complaint and awarded defendant $71,550.08 on its counterclaim. The judgment should be affirmed.

On April 25, 1969 plaintiff entered into a contract to purchase a certain warehouse property in Inwood, New York, from Bass Rock Holding, Inc. (Bass Rock) for the sum of $600,000. After title closed on May 14, 1969 and defendant issued its title policy to the plaintiff, it was discovered that the title search had failed to reveal that a portion of the property conveyed and two of the three streets which provided ingress and egress to and from the property had been condemned by the Town of Hempstead two years earlier, in 1967. On April 23, 1975 plaintiff commenced this action to recover damages of $600,000 on the title policy and $2,000,000 for negligence, alleging that the loss of access had destroyed the value of the property, title to which ultimately was lost to the plaintiff by virtue of mortgage foreclosure.

In its answer to the complaint, defendant pleaded as affirmative defenses that plaintiff had preclosing knowledge of the town's condemnation actions which it failed to disclose, that had this knowledge been disclosed to the defendant the latter would have discovered prior to closing that the two streets in issue had been condemned, that plaintiff's suppression of material facts had voided the policy, that plaintiff's cause of action in negligence was barred by the terms of the title policy which limits the legal remedies available against the defendant, and that it was also time barred because it was commenced more than five years after issuance of the policy. Finally, the defendant counterclaimed for $71,550.08 allegedly expended in plaintiff's behalf for counsel fees, taxes and other expenses incurred in holding off the foreclosure of plaintiff's property.

Evidence adduced at the trial revealed that a group of investors associated with an attorney named Gerald Tucker had formed the plaintiff corporation while Tucker was negotiating to purchase the Bass Rock property. Tucker, subsequently one of plaintiff's stockholders, had become aware of the availability of the property while representing AIC Financial Corp. (AIC) and American Strip Steel which held second and third mortgages on it. When those mortgages were defaulted and he commenced foreclosure proceedings for his clients, Tucker entered into negotiations with the principals of Bass Rock, Helen and Anthony De Giulio, for the purchase of the property.

At the time of these negotiations, ingress and egress to and from the Bass Rock property were over three public streets: Carvel Place to the north of the premises and St. George Street and Jeanette Avenue to its east. The warehouse loading docks for larger trucks were located at the easterly end of the building with direct access from St. George and Jeanette. In order to reach these loading docks from the Carvel Place entrance, it was necessary to traverse a lengthy and narrow alleyway along the northern side of the building. While utilization of the alleyway by large trucks was possible, clearance was so limited that the vehicles sometimes struck the warehouse building.

After the parties agreed on the terms of sale, Tucker and Joseph Tiefenbrun, the attorney retained by plaintiff, met with Bertram Siegeltuch, Bass Rock's lawyer, to discuss details of the contract. Siegeltuch told Tucker that although he was unaware of the exact location of the property involved, Bass Rock was entitled to a $5,000 to $6,000 condemnation award from the Town of Hempstead. As a result of this discussion, the contract, then being drafted, was amended to include a clause assigning "any condemnation award affecting the premises then due or to be due in the future" to plaintiff. Siegeltuch assured Tucker that the necessary information and papers concerning the condemnation would be provided at the title closing.

When title closed on May 14, 1969, Tucker again attended in his self-described capacity as a "principal" of the plaintiff and as attorney for AIC and American Strip Steel, whose mortgages were being satisfied from the closing proceeds. During the closing, and in the presence of the defendant's title closer, Nat Becker, Tucker and Mrs. De Giulio discussed the

property which was the subject of the condemnation award and Mrs. De Giulio outlined it on the Bass Rock title survey. The parcel she sketched was adjacent to the southwestern corner of the Bass Rock property being conveyed at the closing, but it was not part of it nor did it affect any of the access routes to the property.

After title closed, defendant issued plaintiff a title policy which contained the following clause insuring access to abutting public streets: "Notwithstanding any provisions in this paragraph to the contrary, this policy, unless otherwise excepted, insures the ordinary rights of access and egress belonging to abutting owners."

There was no exception in the policy for the condemnation of St. George Street or Jeanette Avenue or the taking along Carvel Place, and it is apparent that the defendant's searchers simply failed to discover the publicly filed records of these takings.

The policy also contained the following provision, which is the fulcrum of this appeal:

"MISREPRESENTATION

"Any untrue statement made by the insured, with respect to any material fact, or any suppression of or failure to disclose any material fact, or any untrue answer by the insured, to material inquiries before the issuance of this policy, shall void this policy."

At the commencement of the trial, Trial Term dismissed plaintiff's second cause of action for negligence as time barred on the ground that it was essentially for malpractice and therefore subject to the three-year Statute of Limitations. At the termination of the trial, the balance of the complaint was dismissed and judgment on the counterclaim was granted to the defendant. Trial Term's decision was based on the assumption that "the Town of Hempstead condemned a portion of the premises and thereby eliminated access by two public highways" and the conclusion that through its agent, Tucker, plaintiff had knowledge of this condemnation prior to the closing and failed to share that knowledge with the defendant. We believe that the judgment should be affirmed but for reasons which differ somewhat from those stated at Trial Term.

According to Tucker's trial testimony, it was only after the title closing and the issuance of defendant's title policy that

plaintiff became aware that the Town of Hempstead previously had condemned a sliver of the property Bass Rock conveyed to plaintiff adjacent to Carvel Place as well as the street beds of Jeanette Avenue and St. George Street. While the closing of the latter two streets unquestionably affected the utility of the parcel, it is difficult to discern how the taking of the small sliver of land along Carvel Place for street realignment could have reduced the value of the property. It is also manifest from the record that the Carvel Place taking had absolutely no effect on the utility of the property.

During the trial, defendant's focus was upon plaintiff's failure to disclose its alleged knowledge of these condemnations to the defendant prior to closing. Plaintiff's response was threefold: that Tucker was unaware of any taking of the property actually conveyed or of the two street condemnations; that he was not an officer of plaintiff and therefore any knowledge he had as a stockholder was not binding upon the plaintiff; and that defendant could not rely upon plaintiff's failure to disclose because Becker, the title closer, overheard the conversation between Tucker and Mrs. De Giulio and therefore the defendant itself had knowledge.

We find the issue of Becker's presence at the De Giulio-Tucker conversation to be spurious since the discussion concerned neither the land which defendant was insuring nor any access to it. If Becker heard the discussion—and we will assume that he did because he was not produced to testify (see *Noce v Kaufman,* 2 NY2d 347, 353)—he learned nothing which would have alerted him to defendant's errors in failing to detect the takings of Jeanette Avenue or St. George Street or of the land along Carvel Place. The dispositive questions, therefore, relate to the state of Tucker's knowledge at the closing, whether his failure to disclose his knowledge amounted to the suppression of a material fact which would bar recovery under the policy, and whether his status in the plaintiff corporation permitted his knowledge to be imputed to the corporation.

In determining that Tucker knew prior to the closing that the two access streets had been condemned, Trial Term relied on the testimony of the defense witness, Abraham Lee, Special Counsel for the Town of Hempstead. Lee stated that in January, 1969 (four months prior to the Bass Rock closing and before any contract was entered into), he had telephoned Tucker to tell him that a portion of the Bass Rock property

being foreclosed by AIC already had been condemned by the town. Lee asserted that he identified the parcel taken as being located adjacent to Carvel Place but that Tucker was not interested. The parcel in question subsequently was indentified in the record as the town's damage parcel 8-6, taken for street realignment purposes. Tucker denied receiving such a call.

Although Lee's testimony as a disinterested witness is persuasive, its acceptance as true, the fact that his call alerted Tucker to the taking of damage parcel 8-6 offers no basis for the further inference, apparently drawn by Trial Term, that Tucker had knowledge of the St. George and Jeanette takings which were part of the same urban renewal project and, in fact, were on the same acquisition map as 8-6.

We thus conclude that the knowledge imparted to Tucker prior to closing concerned both parcel 8-6 at Carvel Place and the unidentified land referred to by Bass Rock's lawyer which Mrs. De Giulio subsequently pin-pointed as being southwest of the property conveyed. Whether this knowledge concerned a material fact, the concealment of which was tantamount to a misrepresentation sufficient to permit defendant to void its title policy, is the primary issue in the case.

I

■ A title policy is a type of indemnity insurance (Insurance Law, § 46, subd 18; § 438) and is governed by the general rules and principles which apply to the issuance, validity, and interpretation of other insurance contracts (7 Powell, Real Property, Title Insurance, par 1038; 5A Warren's Weed, New York Real Property, Title Insurance, § 2.01). The misrepresentation provision upon which defendant relies to avoid liability under its policy apparently is a standard one (see 5A Warren's Weed, New York Real Property, Title Insurance, § 2.08), seemingly adopted in response to the holding in *Empire Dev. Co. v Title Guar. & Trust Co.* (225 NY 53), that knowledge of a defect in title would not bar an insured from recovery on his title policy for losses sustained. The policy provision places the insured under a contractual duty to come forward with any information in its possession material to the risk to be undertaken by the insurer, with notice that a failure to disclose such information will void the policy.

Although the Insurance Law does not define materiality, subdivision 2 of section 149 of the Insurance Law provides:

"No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract."

Since under the terms of the title policy in current issue a failure to disclose a material fact is a misrepresentation sufficient to void the insurer's liability, at first blush the question here would appear to be whether the insurer would have refused to issue the policy had it known the facts in question. But the Court of Appeals has broadened the statutory standard to the extent that the issue to be decided is whether the suppression deprived the insurer of its freedom of choice in determining whether to accept or reject the risk upon full disclosure of all the facts which might reasonably affect that choice (see *Leamy v Berkshire Life Ins. Co.,* 39 NY2d 271; *Vander Veer v Continental Cas. Co.,* 34 NY2d 50; *Geer v Union Mut. Life Ins. Co.,* 273 NY 261). "The question * * * is not whether the company *might have issued* the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it *might otherwise have refused.* 'Any misrepresentation which defeats or seriously interferes with the exercise of such a right cannot truly be said to be an immaterial one.' *(Travelers Ins. Co. v Pomerantz* [246 NY 63], *supra,* p 68." *(Geer v Union Mut. Life Ins. Co., supra,* p 269.)

Although materiality is ordinarily a question of fact, where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine *(Process Plants Corp. v Beneficial Nat. Life Ins. Co.,* 53 AD2d 214, affd 42 NY2d 928; *Vander Veer v Continental Cas. Co., supra).* As an aid to determining whether the individual insurer would have refused to issue the policy in question had it known the undisclosed facts, subdivision 3 of section 149 of the Insurance Law permits evidence of the insurer's practices with respect to similar risks to be shown. In cases involving life or accident insurance policies, that evidence takes the form of testimony by qualified employees of the insurer to the effect that the insurer would not have issued the particular contract it did at the same premium had the facts been disclosed (see, e.g., *Myers v Equitable Life Assur. Soc. of U. S.,* 60 AD2d 942; *Barrett v State Mut. Life Assur. Co.,* 58 AD2d 320, affd 44 NY2d 872; *Wageman v Metropolitan Life Ins. Co.,* 24 AD2d 67, affd 18 NY2d 777). Here, however, there was no testimony as to what action the title company

would have taken had Tucker made it aware of the Carvel Place condemnation. Nevertheless, under the instant circumstances, this omission of proof is not fatal to defendant's cause.

■ While it is obvious that the defendant would not have insured title to the land involved in damage parcel 8-6 at Carvel Place had it known the Town of Hempstead already owned the property, such a refusal to insure by excepting the sliver involved from policy coverage is not necessarily dispositive of the instant issues. Since the taking of 8-6 had no effect on the utility of the property, and it is questionable whether it reduced the value of the remainder of the property, it is at least arguable that the failure to disclose knowledge of that taking was not per se material to the risk involved in issuing the title policy. But the question of materiality is not limited to the knowledge that would have been gained by the insurer from disclosure of the particular suppressed fact alone; it extends to any information that might have been revealed had further inquiry followed the initial disclosure of the suppressed facts *(Anderson v Aetna Life Ins. Co.,* 265 NY 376; *Jenkins v John Hancock Mut. Life Ins. Co.,* 257 NY 289; see *Leamy v Berkshire Life Ins. Co.,* 39 NY2d 271, *supra;* cf. *Massachusetts Mut. Life Ins. Co. v Tate,* 42 NY2d 1046, revg 56 AD2d 173 on dissenting opn of HOPKINS, J.).

■ It is manifest from this record that disclosure of the Carvel Place taking to the defendant would have resulted in the inevitable discovery of the Jeanette and St. George condemnations. There was testimony at the trial that under the recording system in use in Nassau County the master card which revealed the condemnation of Bass Rock's land adjacent to Carvel Place contained a reference to the acquisition map involved. The evidence also revealed that the Carvel Place taking and the taking of St. George Street and Jeanette Avenue appeared on the same Town of Hempstead acquisition map. Thus, a title searcher who examined that map would have had displayed before him the full scope of the town's takings. We conclude as a matter of law that no title insurance company with knowledge of the facts would have insured ingress and egress over streets already condemned for an urban renewal project. Since the net effect of plaintiff's nondisclosure, if Tucker's knowledge is imputed to it, was to deprive the defendant of its freedom of choice in determining the nature, scope and extent of the risk it would assume, we

are constrained to hold that suppression of the information regarding the Carvel Place condemnation was material as a matter of law and would preclude recovery on the policy.

## II

Plaintiff argues, however, that it cannot be held to have suppressed any material knowledge because Tucker was merely a minority stockholder and not an officer of the corporation at the time of the closing and, therefore, his knowledge was not imputable to it. But the authorities cited by the plaintiff for this proposition (see 3 Fletcher, Cyclopedia Corporations [1975 rev vol], § 814; 18 CJS, Corporations, § 5, subd f; 11 NY Jur, Corporations, § 318) refer to efforts to attempt effectuation of notice to a corporation by notifying a person who has no other relationship to the corporation except that of shareholder. They do not apply where the individual otherwise is authorized as an agent to act on behalf of the corporation in a given matter. Every New York corporation has the power to appoint agents other than corporate officers (see Business Corporation Law, § 202, subd [a], par [10]).

■ Agency is a fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act (Restatement, Agency 2d, § 1). The agent holds the power to alter the legal relationship between his principal and third parties in matters within the scope of the agency (Bickford v Menier, 107 NY 490; Walsh v Hartford Fire Ins. Co., 73 NY 5; Restatement, Agency 2d, § 12) and his authority to act may be established circumstantially or by the course of the conduct of the principal's business (Nutting v Kings County El. Ry. Co., 21 App Div 72).

■ Evidence of an agency relationship between Tucker and plaintiff is abundant. Plaintiff originally became aware of the Bass Rock property through Tucker, and Tucker made the initial offer and negotiated the details of the purchase acting as what he described as a "principal" on its behalf. During the contract discussions with Bass Rock's attorney, Tucker was present and insisted that an assignment of the condemnation award be included in the final draft. Tucker reviewed the title report on the property with plaintiff's attorney, Tiefenbrun, and also dealt with the latter in arranging plaintiff's documents for the closing. At the closing it was Tucker who

discussed the location of the condemned property with Mrs. De Giulio. In fact, although Tiefenbrun attended all of these transactions, the record reveals no relevant conduct of the corporation in which Tucker was not an active participant. Patently, his role was not that of a mere observer, bystander or inactive investor; he was the prime mover in the transaction and the direction it took. By all relevant criteria, he was plaintiff's agent and his knowledge must be imputed to it.

## III

The remaining issue concerns Trial Term's dismissal of the second cause of action sounding in negligence on the ground that it was governed by the three-year Statute of Limitations applicable to malpractice actions (CPLR 214, subd 6). Plaintiff urges that a negligent title search by a title insurance company cannot constitute professional malpractice because a title abstractor is not licensed or otherwise engaged in a learned profession and that it has pleaded an action sounding in contract. Plaintiff argues alternatively that the court erred when it failed to apply the rationale of *Sears, Roebuck & Co. v Enco Assoc.* (43 NY2d 389), which held that claims against architects arising out of the performance or nonperformance of contractual obligations, although framed in tort as malpractice, are governed by the six-year contract Statute of Limitations and limited to the contractual measure of damages.

Whatever their merits, these issues are moot because prior to the issuance of the title policy at closing, defendant reported the results of its title search in a document which it denominated the certificate of title. This certificate incorporated a provision making it "null and void * * * upon delivery of the policy." Section 11 of the conditions of the policy provides: "All actions or proceedings against this company must be based on the provisions of this policy. Any other action or actions or rights of action that the insured may have or may bring against this company in respect of other services rendered in connection with the issuance of this policy, shall be deemed to have merged in and be restricted to its terms and conditions."

The contract for a title search is separate and distinct from the contract of insurance; liability for a negligent search arises from the former *(Trenton Potteries Co. v Title Guar. & Trust Co.,* 176 NY 65; *Dokel v Title Guar. & Trust Co.,* 147 Misc 72). Where, as here, the certificate of title has merged in

the subsequently issued title insurance policy, any action for damages arising out of the search—whether sounding in tort or contract—is foreclosed. It has been uniformly held that the liability of an abstractor may be limited and controlled by the contract regardless of whether the action is on the contract or in negligence (see *Broser v Royal Abstract Corp.*, 46 Misc 2d 717, mod 49 Misc 2d 882; Ann. 28 ALR2d 891). In any event, the primary obligation of a title insurance company is to provide a financial guarantee backing its certificate of title rather than simply the preparation of the abstract (see Flick, Abstract and Title Practice, § 864). There is no public policy reason for not giving effect to the merger provisions at issue here.

Finally, there is no basis in this record to challenge the judgment rendered on the counterclaim.

Accordingly, affirmance is mandated.

HOPKINS, J. P., COHALAN and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Nassau County, dated July 27, 1978, affirmed, with costs.