**MUTUAL BENEFIT LIFE INSURANCE CO., In Rehabilitation Successor to Mutual Benefit Life Insurance Co. of Newark, N.J., Plaintiff,**

v.

**Bruce D. LINDENMAN, Defendant.**

**Civil Action No. CV–93–0315 (DGT).**

United States District Court, E.D. New York.

Dec. 28, 1995.

Phillips, Nizer, Benjamin Krim & Ballon, New York City, for Plaintiff.

White, Quinlan, Staley & Ledwith, Garden City, NY, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 to determine the rights and liabilities under a contract of disability income insurance and to recover benefits alleged to have been improperly received by the defendant, Bruce D. Lindenman. Before the court are plaintiff's, Mutual Benefit Life Insurance's (MBL), motion for summary judgment and defendant's, Bruce D. Lindenman's, cross-motion for summary judgment.

## Background

### (1)

In 1982 and 1983, Lindenman obtained two disability policies from MBL in the amount of $6,000 per month. On March 20, 1990, MBL notified Lindenman by letter that, on May 19, 1990, he would be eligible to purchase the additional insurability protection rider on his 1983 disability policy. The letter stated:

This rider allows you to purchase additional coverage at specified intervals. Additional coverage can be purchased subject only to financial underwriting (*no medical evidence need be furnished.*) Now is the perfect time to review your needs with your agent because an option will become available on May 19, 1990. Your agent ... will be in contact with you to discuss the matter. Exh. B of Lindenman's Aff., dated 8/29/94, (emphasis in original).

Shortly after receiving this letter Lindenman was contacted by Seymour Lubchansky who had been an agent for MBL for about six years. On April 12, 1990, Lubchansky and Lindenman met at Lindenman's home where Lindenman, with Lubchansky's assistance, completed an application for an additional $750 of disability insurance. One question in the application requested information concerning Lindenman's existing disability insurance policies; to this inquiry, he replied that he had two MBL policies. Specifically, the application appears as follows:

"b) Present disability income insurance:

| Company | Yr. Issued | Monthly Benefit | Benefit Period Sick/Accident |
|---|---|---|---|
| MBL | 1982 | 3000 | 65/ L |
| MBL | 1983 | 3000 | 65/ L" |

Lindenman signed the application below a statement which reads, in relevant part:

The undersigned represents that the foregoing statements are true and complete. It is agreed that a) the only statements that are to be considered as the basis for the new policy are those in the application ... c) the policy will become incontestable as to the statements in this application at the end of the stated period measured from the issue date of the new policy ... d) no one except the President or a Vice President can make, alter, or discharge contracts or waive any of the Company's rights or requirements.

As MBL's underwriting guidelines for disability income insurance only required review of applications for more than $1,501 per month of coverage, and Lindenman was applying for an additional $750 per month of coverage, MBL did not investigate the representations in his application. Chumas Aff. at ¶ 13. Presently, MBL is claiming that without knowledge of a $3000 per month policy issued by Penn Mutual, it approved the additional $750 rider which it would not have done had it known the true total amount of Lindenman's disability policies. For under MBL's guidelines that determine the amount of disability insurance one can have based on one's annual wages and salary, Lindenman was ineligible for coverage of $9,750 per month.

Lubchansky, the MBL agent, acknowledges that he knew of the third policy, the Penn Mutual policy, but that "[i]t was not [his] intention to leave out that information on the application." Letter from Lubchansky to MBL, dated 3/30/92, Exh. U of Lindenman's Aff. Lindenman, however, alleges that Lubchansky told him that the Penn Mutual policy was irrelevant because only MBL policies needed to be listed. Lindenman's Aff. at ¶ 3. Lubchansky denies making such a statement. Lubchansky's Dep.Tr. at 60–61; 86–87; 91; 100–01; 114. Lindenman also claims that it was Lubchansky who filled out the form and that Lindenman then signed it and paid the first annual premium. Lindenman's Aff. at ¶ 4.

### (2)

On the application form, Lindenman entered his annual earned income (after business expenses and before taxes) as $233,000. MBL Dis. Income, Application for Ins., dated 4/12/90, Exh. C of Lindenman's Aff. According to George Chumas, the Claims Underwriting Officer of Individual Insurance Administration at MBL, Lindenman misrepresented his earned income in the application. The policy defined "earned income" as "the total of all wages, salaries, fees and other amounts earned by the insured. Earned income does not include income from investments, pensions, or deferred compensation

plans." MBL Disability Income Policy, at 7, Exh. A. of Lindenman's Aff. Lindenman noted that his earned income was $233,000 when his tax return claimed his earnings to be $204,504, of which only $131,218 came from wages, salaries, etc.[1] The remainder came from investment interest as well as a severance arbitration agreement, and thus *would reduce the amount of disability benefits that he would be entitled to collect.* Chumas' Aff. at ¶ 24; Lindenman's 1989 Form 1040 as Exh. J to Chumas' Aff; *see also* Chumas' Dep.Tr. at 48–49. Furthermore, MBL's underwriting manual, the Excalibur Premium Guide, dated April 1990, required an annual earned income of approximately $307,000 to receive $9,750 per month in disability benefits. Chumas' Dep.Tr. at 32.

On September 1, 1990, Lindenman submitted an application for disability benefits resulting from an accident which occurred in February of 1989 at the Westwind Yacht Club Restaurant. MBL's Disability Claim, Claimant's Statement, dated 9/1/90, Exh. D of Lindenman's Aff. This application also noted that Lindenman's earned income for 1989 was $210,000 when in fact his tax form noted $204,504 and his application for the rider disability policy claimed his 1989 income as $233,000. In addition, on the application for benefits, Lindenman disclosed that he had a Penn Mutual policy from which he is eligible to collect $3,000 per month.

On September 20, 1990, Ann Crucilla, a senior benefit analyst, wrote to Lindenman explaining that she was reviewing his physician's records and requesting his 1988 and 1989 tax returns. After receiving the tax returns, she wrote to Lindenman again stating:

> We have received your tax returns and note a discrepancy. On the application for H429,061 [the additional disability policy for $750] you indicated your earnings as [$]230,000 annually. Your 1989 tax return shows [$]204,504. 1988 was [$]61,060. Please explain discrepancy. . . .

An internal recommendation form completed by MBL in late September and early October 1990, apparently used to determine whether benefits should be paid or not, analyzes the tax returns noting that to receive $9,750 per month in disability benefits, Lindenman would have to earn over $300,000 per year. The memorandum's recommendation, however, was to wait and analyze the doctors' records and to check with Penn Mutual. Exh. F of Lindenman's Aff.

On October 3, 1990, Jane McDougall, the Supervisor of Disability Claims, stated in an internal memorandum that Lindenman had a non-disclosed Penn Mutual policy and that he would receive a total of $9,750 per month in disability, even though his stated income was only $230,000. She noted, as in the earlier recommendation form, that in order to receive $9,750 per month in disability, Lindenman would have to earn at least $300,000 per year. MBL Memo form signed "JM," dated 10/3/90, Exh. F of Lindenman's Aff.

### (3)

During this period, MBL continued to research the medical aspects of the disability claim and, in February 1991, denied benefits to Lindenman on the basis that he was not medically disabled from his occupation. The letter specifically stated that MBL "completed [its] review of this claim in its entirety." Exh. J of Lindenman's Aff. After reviewing additional letters from Lindenman's doctors, MBL reversed its February decision and paid the benefits under all three policies on May 20, 1991; Letter to Lindenman from MBL, dated 5/20/91, Exh. L of Lindenman's Aff.; Olsen's Aff. at ¶ 7, 8, 11.

According to Lindenman, he relied upon his receiving $9,750 per month in disability benefits when determining his monthly expenses. He has submitted evidence of refinancing his mortgage, dated September 24, 1991, in which he reduced his monthly payments by paying $175,000 of the amount owing on the mortgage—which had been $440,000, and after this payment was $300,-000. Lindenman Aff. ¶¶ 36–37. Furthermore, Lindenman provides a detailed accounting of the family's monthly budget within the $9,750 limit. *Id.* at ¶ 38.

---

1. There is a question as to whether Lindenman was even fully employed when applying for the additional disability policy and when claiming his disability as required by MBL.

However, on January 30, 1992, after a reinsurer's audit, McDougall sent a memorandum to Chumas explaining, as she had written in October 1990 and subsequently "forgot about," that Lindenman's policy noted his income as $233,000 in 1989 when his total earnings according to his tax form were $204,504. Similarly, she disclosed the existence of the Penn Mutual policy issued in 1986. She then asked: "If the above were now at issue, what would our underwriting action have been?" Chumas replied on the bottom of the memorandum, initialed and dated "GC" "1/31/92," that "total of [$]9000/mo[nth] in force, we would not have issued AIP option policy. $9000/mo[nth] over insurance based on $204,504 and even $233,000 alleged income." Exh. O of Lindenman's Aff.

In a letter to Lindenman, dated February 11, 1992, MBL reversed itself again, explaining that after "recently complet[ing] an independent claim investigation" and recognizing that Lindenman failed to list the Penn Mutual policy on his application for coverage, the policy is denied since he materially misrepresented his coverage on the application. McDougall wrote: "If [MBL] had been aware of the Penn Mutual policy and the fact that you actually had $9,000 in force disability income insurance, [MBL] would not have issued any policy." Exh. P of Lindenman's Aff. McDougall noted during her deposition that the letter of recision was written after North American Reinsurance audited the file. Dep. at 44, 51, Exh. N of Lindenman's Aff. Further, the letter stated that it had paid Lindenman $11,630.50 between November 1990 through February 1992, and demanded that Lindenman pay MBL back. Exh. P of Lindenman's Aff.

Subsequently, Lindenman's cousin, Gerald Pasahow, wrote MBL attempting to demonstrate that Lindenman's income was accurately noted in the application, and that there was no genuine discrepancy between the income he stated on the claim, $203,929, and the income he stated on the application, $234,617. He first claimed that the approximately $30,000 difference was based on legal fees incurred by the defendant. Second, he notes that the average of Lindenman's income for the preceding five years was at least $234,000. Letter to MBL, dated 3/4/92, Exh. Q of Lindenman's Aff. McDougall responded for MBL on March 18, 1992, explaining that when determining monthly benefits, an average income for prior years is not utilized. "As the application was signed April 12, 1990, we would base the issue amount on your 1989 earned income reported to the IRS." MBL letter, dated 3/18/92, Exh. R of Lindenman's Aff.

Because Lubchansky did "not have the authority to waive the terms of the policy," and because of "material misrepresentation in the application" for additional benefits, on April 14, 1992, MBL again wrote to Lindenman requesting recovery of the amount paid to him, $11,630.50. Exh. V of Lindenman's Aff. When Lindenman did not comply, MBL brought suit in January 1993 requesting a declaratory judgment and an order for the defendant to repay the amount previously allocated to him. Lindenman counterclaimed for a declaratory judgment that the policies were still valid and that he should be paid under them. He further brought claims for attorney fees and treble damages claiming that the suit was fraudulent and deceptive and requested damages for breach of contract and punitive damages.

(4)

Lindenman also claims that by denying him the benefits of the policies and subsequently accepting the policies, MBL waived its right to contest the application of the policy.

In response, McDougall asserts that Lindenman's claim was denied, and later accepted, on a medical basis only. According to her, MBL did not waive its right to seek recision of the contestable disability policy since Lindenman's failure to disclose the existence of the Penn Mutual policy was not raised when the money was given to him. McDougall's Aff. at ¶¶ 15–17. McDougall further noted: "I took ... steps to rescind disability policy H429,061 well within the policy's period of contestability found at Section 8.4. By this standard provision of the policy ... [MBL] specifically reserved its right for two years (excluding any period of disability) to contest the validity of policy H429,061 on the basis of representations in the Applica-

tion." McDougall's Aff. at ¶ 21. The relevant provision of the policy reads:

> After this policy has been in force for two years during the life of the insured, excluding any time that the insured is disabled, we will not contest it on the basis of the statements in the application. ¶ 8.4 MBL policy, Exh. N of McDougall's Aff.

### (5)

Finally, it is important to note that Lubchansky's agreement with MBL states that:

> The agent is an independent contractor and not an employee for federal or state income tax withholding purposes. Nothing in this Agreement is intended to create the relationship of employee and employer between the Agent and the Company and/or the General Agent. Agreement for Standard Soliciting Agents (No. 872), Exh. B of Lindenman's Aff.

And, the agent's duties respecting selling policies are described as follows:

> Devote his efforts regularly and systematically as a full time agent to the solicitation of contracts of the company; provided that he shall be free to determine from whom, when, where and how he will solicit. Conform to all current and future rules and practices of the General Agent and the Company regarding the conduct of their business. *Id.* at 2.

Moreover, Lubchansky, like MBL's other agents, was paid on a commission basis as a percentage of the premiums.

### Discussion

This case is one of the many cases which have considered whether a misrepresentation in an application for an insurance policy is material, and, if so, whether the insurer is estopped from denying the benefits. In determining the latter question, a number of issues must be explored. Further, in this case, an additional issue that must be addressed is whether the insurer is entitled to repayment of the funds it gave to plaintiff.[2] In resolving these summary judgment mo-

tions, the facts, of course, must be construed in the light most favorable to the party opposing the particular motion.

### (1)

■ The first issue that must be explored is whether the misrepresentations on the application for the additional disability coverage are material.

In the various insurance memoranda, two misrepresentations in Lindenman's application are noted. One involves Lindenman's earnings that were less than he claimed—his 1989 tax return showed Lindenman earning $204,000, approximately $73,000 of which came from investment interest and other income which would not be included as earnings by MBL in calculating his maximum disability coverage. Second, Lindenman failed to report on the application the existence of his Penn Mutual disability policy for $3,000 per month coverage.

To determine whether a misrepresentation is material, courts have looked at:

> whether failure to furnish a true answer defeats or seriously interferes with the exercise of the insurance company's right to accept or reject the application. The major question is whether the company has been induced to accept an application which it might otherwise have refused. *Process Plants Corp. v. Beneficial National Life Ins. Co.,* 53 A.D.2d 214, 216–17, 385 N.Y.S.2d 308 (1st Dep't 1976), *aff'd.,* 42 N.Y.2d 928, 397 N.Y.S.2d 1007, 366 N.E.2d 1361 (1977).

Whether there has been a misrepresentation, and whether it is material are usually questions for the jury. However, where the evidence is "clear and substantially uncontradicted," the court may determine it. *L. Smirlock Realty v. Title Guarantee Co.,* 70 A.D.2d 455, 462, 421 N.Y.S.2d 232 (2d Dep't 1979). For the court to determine materiality as a matter of law, unequivocal evidence is required of the insurer's practice concerning similar risks, or the insurer's manuals, or "testimony of qualified employees of the insurer that the insurer would not have issued

---

**2.** MBL also contends that the Uniform Insurers Liquidation Act requires a dismissal of Lindenman's counterclaims. Because of the court's

principal determination, this argument is now moot.

the particular contract it did had the facts been disclosed." *Cohen v. Mutual Benefit Life Ins. Co.*, 638 F.Supp. 695, 697 (E.D.N.Y. 1986), citing *Wittner v. IDS Ins. Co. of N.Y.*, 96 A.D.2d 1053, 466 N.Y.S.2d 480 (2d Dep't 1983); *L. Smirlock Realty*, 70 A.D.2d at 462 (asking whether the insurance company would not have issued the specific policy at the identical premium had the insured disclosed the true facts); *see also Mutual Benefit Life Ins. Co. v. JMR Electronics Corp.*, 848 F.2d 30, 32 (2d Cir.1988) (denying a smoker a life insurance policy when he claimed he was a non-smoker in his application and thereby paying a lower premium rate, finding this to be a material misrepresentation since "knowledge of . . . the facts misrepresented would have led to a refusal by the insurer to make such a contract."); *Friedman v. Prudential Life Ins. Co.*, 589 F.Supp. 1017, 1026 (S.D.N.Y.1984) (reasoning that the essential element in deciding whether a misrepresentation is material is if the insurer knew the truth, instead of the misrepresented facts would it have refused to issue the policy and finding that the insurance company would have not insured the plaintiff's husband if he had acknowledged on his application his serious heart condition, and thus the misrepresentation was material); *Kulikowski v. Roslyn Savings Bank*, 121 A.D.2d 603, 503 N.Y.S.2d 863 (2d Dep't 1986) (finding omission of names of doctors and conditions treated constituted a material misrepresentation because an insurance agent said that no matter how mild the hemorrhagic disorder was he would not approve such an applicant even though the underwriting guidelines do not outrightly deny such an applicant).

"[T]he test of materiality [is] whether knowledge of the facts would have influenced the insurer in determining whether to accept the risk or in fixing the amount of premiums . . . ." 45 C.J.S. Insurance § 595, at 406; *see also* 7 G. Couch, Cyclopedia of Insurance Law § 35:79, at 127 (2d ed. 1985) ("[T]he test of materiality is: Did the fact or circumstance represented or misrepresented operate to induce the insurer to accept the risk, or to accept it at a lower premium?"); *Johnson v. United States Life Insurance Co.*, 4 A.D.2d 825, 825, 164 N.Y.S.2d 748 (4th Dep't 1927) ("[T]he question of materiality depend[s] upon whether the insurer would have issued the standard policy at the standard rate").

Furthermore, an insured's partial disclosure "is as much a misrepresentation as a false affirmative statement." *Vander Veer v. Continental Cas. Co.*, 34 N.Y.2d 50, 52, 356 N.Y.S.2d 13, 312 N.E.2d 156 (1974). In *Vander Veer*, the plaintiff sued for proceeds from a group insurance policy in which he was enrolled. In the master policy all enrollees were guaranteed coverage under "Plan C" providing $500 per month regardless of their medical histories. The plaintiff applied for $1,000 monthly coverage under "Plan A" which was accepted by the insurer because of misrepresentations he made in his medical history. Because of the special circumstances in the policy, even though plaintiff had made material misrepresentations he was able to collect from "Plan C."

In *Cohen, supra*, the insured misled the insurer by claiming that he did not have diabetes and that while he had heart trouble in the past, there was no recurrence when in fact the insured had both diabetes as well as serious heart trouble when he completed the life insurance application. The company noted that Cohen would not have been insured if he had disclosed these conditions. "[T]hese guidelines [of the insurance company] show that Solomon Cohen . . . would have been an unacceptable risk to MBLI if these conditions had been disclosed at the time of his application." *Id.* at 697. The court found that even if Cohen did not knowingly misrepresent his condition, "an innocent misrepresentation is sufficient to allow a rescission of the contract." *Id.*, citing, *Process Plants Corp. v. Beneficial National Life Ins. Co.*, 53 A.D.2d at 216, 385 N.Y.S.2d 308. Thus, Cohen's omission of a portion of his medical history was a misrepresentation. And, because the insurer documented that if Cohen revealed the seriousness of his heart condition it would not have insured him, the misrepresentation was material. *See also Mutual Benefit Life Ins. Co. v. Morley*, 722 F.Supp. 1048 (S.D.N.Y.1989) (finding that the insured materially represented her application for life insurance when she only in-

formed the insurer of three of her eight periods of hospitalization for psychiatric treatment one of which related to a suicide attempt, because, through affidavits and deposition testimony, the insurer established that it would not have issued the policy had it known of her suicidal state); *Friedman v. Prudential Life Ins. Co.*, 589 F.Supp. at 1027 ("finding a material misrepresentation where an underwriting manual states that if certain conditions are present a policy cannot be issued, and the defendant did not report those conditions."); *Crotty v. State Mutual Life Assurance Co.*, 80 A.D.2d 801, 437 N.Y.S.2d 103 (1st Dep't 1981); *New York Life Ins. Co. v. Miller*, 17 Misc.2d 532, 47 N.Y.S.2d 654, 655 (N.Y.Cty.1944) (explaining that the purpose of the application is to inform the insurers of the risk it would be taking if the policy would issue).

In light of these New York authorities, because internal memoranda, based on uncontested underwriting guidelines, establish that had MBL known either of Lindenman's correct income or of his additional disability policy with Penn Mutual, it would not have approved the rider policy, there were material misrepresentations.

### (2)

Since there were material misrepresentations, the question now becomes whether MBL is estopped from rescinding the policies based either on equity or the possibility that the broker knew of the Penn Mutual policy and suggested that it be excluded from the application.

### (a)

■ "While it is true that an insurer's specification of one of several available grounds for disclaimer may be taken by the insured as an indication that the other grounds have been overlooked, as a basic matter of fairness we see no reason why this circumstance should operate to bar the later assertion of the other grounds for disclaimer where the insured cannot claim to have suffered any degree of prejudice." *Guberman v. William Penn Life Ins. Co.*, 146 A.D.2d 8,

538 N.Y.S.2d 571, 573 (2d Dep't 1989). "[M]ere delay in disclaiming coverage does not suffice to estop an insurer from disavowing liability. [However,] the doctrine of estoppel has been applied where the insured has been prejudiced as a result of unreasonable delay in failing to disclaim." *Greater New York Savings Bank v. Travelers Ins.*, 173 A.D.2d 521, 522, 570 N.Y.S.2d 122 (2d Dep't 1991). Thus, when considering whether an insurer is estopped from bringing another claim, courts consider whether the insured will be prejudiced by such an insurer's action.

■ Lindenman maintains that once the insurance carrier began to pay the claim, it could not later deny benefits based upon a misrepresentation in the application for coverage whether or not the insured relied upon receiving the payments and changed his position.[3] Def's Memo. of Law, dated 8/29/94, at 5, 7. Lindenman maintains: "These facts constitute a classic case for equitable estoppel" because he claims that MBL was fully aware of the misrepresentation when it decided to start paying the policy. Lindenman cites *Zeldman v. Mutual Life Ins. Co. of New York*, 269 A.D. 53, 53 N.Y.S.2d 792 (1st Dep't 1945), for the negative pregnant proposition that "[o]rdinarily, the insurer is not deemed to have waived its rights unless it is shown that it has acted with full knowledge of the facts."

In *Zeldman*, the plaintiff noted on his application for term life insurance that he was in good health. A year later, he applied to convert his term policy to a whole life policy in which he noted he had had "treatments and operation for intestinal disturbance," when in fact he had an operation for the removal of his spleen. In this second application, the company was bound to accept the application regardless of his health condition. "The general rule applicable to waiver is that the delivery of a policy or the receipt of premiums with knowledge of a then existing breach of condition as to the health of the insured or his treatment, will give rise to a waiver or, more properly, an estoppel." *Id.*

---

**3.** Lindenman also asserts that once payments are made by the insurance carrier pursuant to coverage terms, it may not later demand a return of benefits paid in a rescission action that claim is discussed *infra* at § 3.

at 794. The court found that the insurer was not on notice of a spleen operation or anything that serious from the insured's statement that he had "treatments and operation for intestinal disturbance." *Id.* at 796.

Unless we are to say that an insurance company must discredit positive affirmations of good health made when the policy is issued, and look suspiciously and searchingly upon every statement it receives concerning subsequent illnesses so as to ascertain whether such illnesses might possibly have had their inception early enough to disclose falsity of the earlier affirmations, this record presents no evidence of waiver. *Id.*

In *Guberman,* 146 A.D.2d at 9, the plaintiff's husband applied for a life insurance policy claiming he was a nonsmoker for the last twelve months preceding the issuance of the policy. The insurance company notified Guberman that her husband made a material misrepresentation about his physical condition because he had smoked. When plaintiff brought this action to receive her benefits, the insurer answered that there was a material misrepresentation when the insured answered "no" about whether he had chronic hoarseness or cough. In this case the insurance company expressly informed the plaintiff that disclaiming liability on one ground should not be construed as a waiver of other potential defenses. *Id.* at 13. With such an explicit statement of non-waiver of other defenses, Guberman could not have been prejudiced.

Although such a statement was not included in Lindenman's first denial for coverage, he was well within the period of contestability and was on notice of MBL's concerns about the amount of his earned income as well as the Penn Mutual policy since his receipt of MBL's letter, dated October 15, 1990. Exh. C of McDougall's Aff. Furthermore, he should have been aware of the statement on the rider policy which specifically explained that an agent cannot alter the terms or requirements of the policy.

■ Moreover, in addition to the waiver argument that Lindenman asserts, he also maintains that because he re-financed his mortgage in September 1991 in reliance upon his receipt of $9,750 per month in disability benefits, the denial of the benefits will prejudice him, and thus MBL cannot now rescind this policy.

"To show prejudice, the insured must show reliance and a change in position resulting from the delay." *William Crawford, Inc. v. Travelers Ins. Co.,* 838 F.Supp. 157, 160, *aff'd.,* 23 F.3d 663 (2d Cir.1994). Where no prejudice exists the insurer is not estopped from denying benefits as a matter of law. 69 N.Y.Jur.2d *Insurance* § 1285 (1988). "Whether the plaintiff has suffered a degree of prejudice significant enough to warrant the imposition of an estoppel is a question of fact, as is the question of whether the defendant's affirmative defense will ultimately prove to be meritorious." *Id.* at 14.

■ Here, it must be recognized that MBL is only canceling the additional rider policy of $750 per month. Thus, Lindenman will still be receiving $9,000 per month in disability benefits. Although this might have disrupted Lindenman's budgetary planning, this "prejudice" asserted by Lindenman is not of the caliber required in the case law to estop MBL from rescinding its policy. For even if Lindenman did refinance in expectation that he could make his payments conform to his expected monthly disability benefits, still there is no prejudice because he would have to pay his mortgage regardless of the amount of his income.[4] Consequently, MBL is not estopped from now rescinding Lindenman's policy upon the ground that its initial denial was based upon a MBL belief that medically he was not disabled. Exh. J of Lindenman's Aff.

**(b)**

Lubchansky stated in his deposition, on May 30, 1995, that he was at that time a

4. Furthermore, it appears that the interest rates for most of 1987, when the mortgage was first taken out, were approximately two percentage points higher than the interest rates for September 1991 according to the Internal Revenue Bulletin's listing of applicable federal rates for June 1987, Revrul 87–42, September 1987, Revrul 87–83, December 1987, Revrul 87–128, and September 1991, Revrul 91–48.

broker with two insurance companies and an agent for MBL. Lubchansky Dep. at 12. According to Lubchansky, "a broker's first allegiance is to the client, whereas with an agent the first allegiance would be with the company." *Id.* at 10. When asked if he was an employee of MBL, he replied, "I was an agent for MBL." *Id.* at 16. Furthermore, Lubchansky said that under the terms of his soliciting agent's contract with MBL, he did not have the authority to waive any requirements of an application. *Id.* at 117.

■ In *Friedman v. Prudential Life Ins. Co.,* 589 F.Supp. 1017 (S.D.N.Y.1984), the court held "[a]ny misrepresentations or waivers made by the defendant's agents, however, are not relevant to this action. The policy contained a clause stating 'no agent can make or change a contract or waive any of Prudential's rights or needs.'" "Under New York law, an insurance carrier is not bound by the acts of its agent when they were not within the scope of the agent's authority and the insured had actual notice of the limitation of the agent's authority." *Id.* at 1023, citing *Spiegel v. Metropolitan Life Ins. Co.,* 6 N.Y.2d 91, 188 N.Y.S.2d 486, 160 N.E.2d 40 (1959). *See also Kantor v. Nationwide Life Ins. Co.,* 16 A.D.2d 701, 227 N.Y.S.2d 703 (2d Dep't 1962); *Lau v. Guardian Life Ins. Co.,* 78 Misc.2d 332, 336 (Civ.Ct. City of N.Y.1974) ("In the present case, where the application was annexed to the policy at the time of delivery, the question as to whether the decedent revealed the physician's visit to the selling agent becomes irrelevant as a matter of law ..."); *Gam v. Equitable Life Assurance Soc.,* 67 Misc.2d 724, 325 N.Y.S.2d 241 (Sup.Ct. Bronx Cty.1971). The court continued by explaining that because this clause was right above where the insured had to sign the application and the policy warns the applicant to read the application with care, the insured "cannot contend that the insured was not aware of the limitation." *Id.* "Thus any alleged affirmative statement made by any agent of the defendant to the effect that the insured need not report certain treatment on his application is irrelevant to this action as a matter of law." *Id.,* citing *Simon v. Govt. Employees Life Ins. Co.,* 79 A.D.2d 705, 434 N.Y.S.2d 447 (2d Dep't 1980). Furthermore, the insured has the duty to examine the policy and to correct any inaccuracies. *Minsker v. John Hancock Mutual Life Ins. Co.,* 254 N.Y. 333, 338, 173 N.E. 4 (1930).

■ In *McGarry v. Miller,* 158 A.D.2d 327, 550 N.Y.S.2d 896 (1st Dep't 1990), the plaintiff, an insured, sued MBL, Bernard Mayer and Marvin Meyer, the general agents, and an insurance broker, Russell Miller, for fraud. The court held that "a principal is only liable for the conduct of an agent acting within the scope of his authority." *Id.* at 328, 550 N.Y.S.2d 896. In *McGarry,* since making fraudulent misrepresentations were not reasonably or necessarily incidental to that which Miller was authorized to do and since neither MBL or Mayer and Meyer had any contact with the plaintiff, the plaintiff could not sustain the fraud action.

In two cases in which New York courts have held that the insurance company was liable for an agent's misrepresentation, the agent failed to comport with state insurance regulations. These cases focused upon the fact that by violating these state regulations, the insurance company hindered public policy. *See Trainor v. John Hancock Mutual Life Ins. Co.,* 54 N.Y.2d 213, 445 N.Y.S.2d 81, 429 N.E.2d 759 (1981) (where life insurance company failed to comply with the applicable insurance department regulations when issuing a replacement life policy, which require the agent to obtain a statement listing existing policies and whether the new policy supplements or replaces any existing policy, insurer is precluded from disclaiming liability); *Tannenbaum v. Provident Mutual Life Ins. Co.,* 41 N.Y.2d 1087, 396 N.Y.S.2d 351, 364 N.E.2d 1122 (1977) (where the insurer's agent misrepresented the advantages and disadvantages of policies and failed, as required by insurance department regulations, to inform the prior insurance company of the contemplated replacement of the existing policies it issued, and this was "inconsistent with public policy," the insurer was liable for the agent's misrepresentation.)

Here, in the MBL file, an internal document, dated March 23, 1992, states the following: "[C]alled Sy [Seymour Lubchansky]. He was aware of policy with Penn Life but forgot to put it down." Exh. 9 of Lubchan-

sky Dep'n. Lindenman's lawyers imply that Lubchansky had a motivation to lie on the insurance application, since he received a commission for the sale of the additional $750 policy. They cite references in his deposition stating that if an agent does not sell policies, he starves. And, "the very nature of the answers given by Mr. Lubchansky demonstrate his own effort to exculpate himself from creating the underlying situation which eventually led to the issue now before the Court." Ledwith Letter to Court, dated October 12, 1995, at 5. However, applying the standard of *Friedman*, because there was a non-waiver clause almost identical to that in *Friedman* plainly written on the application just above where the applicant must sign which Lindenman had to have read prior to signing, MBL is not bound by Lubchansky's actions even if he had assured Lindenman that the Penn Mutual policy was not relevant. Furthermore, assuming Lubchansky deliberately misinterpreted the application's requirement to the effect that only MBL's policies need to be listed, this misrepresentation violated no insurance department requirement such that the insurer would be chargeable with the agent's misconduct as in *Trainor* and *Tannenbaum*. The insurance company here sought the information for its own underwriting reasons and not because of any state regulation.

(3)

Turning to the last issue, if the insurance company can rescind the policies, can it also recover benefits improperly received by the defendant?

Lindenman maintains that once payments are made by the insurance company pursuant to the terms of that coverage, it may not later demand a return of benefits paid in a recession action. Def.'s Memo of Law at 6. The main inquiry in any action for repayment is "whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film Distr. v. State of New York*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972); Restatement, *Restitution*, § 1; 50 N.Y.Jur., *Restitution*, §§ 1, 3; *see also Liberty Mutual Ins. Co. v. Newman*, 459 N.Y.S.2d 806, 808, 459 N.Y.S.2d 806 (2d Dep't 1983).

"The general principle that money paid under a mistake of fact may be recovered back, even though the mistake [is] due to the negligence of the party making the payment, is of course well established but the courts of this state repeatedly have held that, at least in the absence of fraud, which is not here alleged, an insurance company which executes its contract of insurance by paying the amount specified therein cannot thereafter recover back such payment on the ground that it subsequently has discovered facts which would have justified it in withholding the payment." *New York Life Ins. Co. v. Guttenplan*, 30 N.Y.S.2d 430, 432 (N.Y.Cty. 1940). The court continued to explain that insurance companies have an obligation "to investigate the facts upon which its liability to pay depends before making payment under the policy ..." *Id.* at 433. "[T]here is nothing inequitable in requiring an insurance company to investigate before paying, at least where, as here, it has notice of the need for investigation and there is then available to it all the evidence which it adduces as the basis of its action." *Id.* In *Guttenplan*, the insurer was attempting to recover amounts paid under the decedent's life insurance policy claiming that decedent lied on the application for insurance about his date of birth, making himself younger than he actually was. The court placed particular emphasis on the fact that the insurance company issued the policy "[d]espite that manifest discrepancy," *id.* at 432, and that eight years later the insured wrote the company that his date of birth was ten years later than what was claimed on the policy. *Id.; Schwartz v. Equitable Life Assur. Soc. of United States*, 266 A.D. 231, 41 N.Y.S.2d 758 (1st Dep't 1943).

Similarly, the court in *Mutual Life Ins. Co. of New York v. Wager*, 27 Barb. 354, 367–68, stated that if insurers knew at the time they paid the loss, "or upon inquiry might have informed themselves, of the grounds upon which they might have resisted the claim, they cannot afterwards recover it back; for it would open the door to infinite litigation."

■ Here, as MBL's internal memoranda demonstrates, company officials knew of Lindenman's misrepresentations about both issues but ignored them or forgot about them. This was not an instance where the insurance company was unable to ascertain the true situation because of the acts of the insured. Indeed, at the time they began making payments they had the necessary information in their possession, but failed to act upon it. MBL's handling of the claim was certainly "sloppy." Had it not forgotten or ignored the disparity in income as well as the existence of the third disability policy for months, this case may not have arisen since MBL would never have paid money to Lindenman. Consequently, MBL should not be able to reclaim the money paid to Lindenman.[5]

### Conclusion

Because the disability insurance application contained two material misrepresentations—the amount of his income and the existence of another disability policy—MBL can rescind the policy as these discoveries were within the contestability period. It is irrelevant that Lubchansky, the insurance broker, may have told Lindenman that the Penn Mutual policy need not be included on the application, because Lindenman signed the application which clearly stated both that the insured had the responsibility to accurately answer each question and that only the president or vice president of the company could waive any of the requirements. Furthermore, since no prejudice was proven, MBL is not estopped from rescinding coverage. Thus, the plaintiff's summary judgment motion for recision is granted but denied insofar as its claim for reimbursement. The defendant's cross-motion for summary judgment is denied; his counterclaims are dismissed as moot.

SO ORDERED.

---

5. Interestingly, nowhere in the insurer's brief does it mention the issue of reimbursement im-plying that, as shown, the facts are not favorable for MBL.