Watts Guerra LLC v. Series 1 of Oxford Ins. Co. NC LLC, 2026 NCBC 17.

STATE OF NORTH CAROLINA

WAKE COUNTY

WATTS GUERRA LLC,

        Plaintiff,

        v.

SERIES 1 OF OXFORD INSURANCE
COMPANY NC LLC,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV023398-910

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO
DISMISS**

1.    **THIS MATTER** is before the Court on Defendant's Motion to Dismiss pursuant to North Carolina Rule of Civil Procedure (Rule(s)) 12(b)(6) (Motion), (ECF No. 7).

2.    The Court, having considered the Motion, the related briefing, and the arguments of counsel at a hearing on the Motion, concludes for the reasons stated below that the Motion should be **GRANTED in part** and **DENIED in part**.

> *Parker Poe Adams & Bernstein LLP, by Charles E. Raynal, IV and Cristina C. Stam, and Susman Godfrey, LLP, by Shawn Rabin, Samir Doshi, and Bill Carmody, for Plaintiff Watts Guerra LLC, a Puerto Rico Limited Liability Company.*
>
> *Tharrington Smith, LLP, by David Noland, and Debevoise & Plimpton LLP, by Susan Reagan Gittes, Ardis Strong, and Jaime Fried, for Defendant Series 1 of Oxford Insurance Company NC LLC, a North Carolina Limited Liability Company.*

Earp, Judge.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

3.    The Court does not make findings of fact when ruling on a motion to dismiss. *See Taylor v. Bank of Am., N.A.*, 382 N.C. 677, 679–80 (2022) (citations

omitted). It recites below the factual allegations in the Complaint and its exhibits that are relevant to the Motion before the Court.

4. Plaintiff Watts Guerra LLC (Watts LLC) is a Puerto Rico limited liability company with its principal place of business in Puerto Rico. (Compl. ¶¶ 6, 8, ECF No. 3.) Its sole member is Mikal Watts. (Compl. ¶ 8.)

5. Defendant Series 1 of Oxford Insurance NC LLC (Oxford), a special-purpose captive insurance company licensed by the state of North Carolina, (Compl. Ex. 1 § IV.E [Policies], ECF No. 3), is a Delaware LLC with its principal place of business in North Carolina, (Compl. ¶ 7).

6. In September 2021, Watts LLC invested in mass tort lawsuits brought by New York law firm Gacovino, Lake & Associates, P.C. that were valued at more than $340 million (Gacovino Book). (Compl. ¶¶ 1, 12–13.)

7. Watts LLC also paid a total of $7 million to purchase twelve $10 million insurance policies from Oxford (Policies).[1] (Compl. ¶¶ 2, 4, 14–15.) The insurance was intended to cover any shortfall between Watts LLC's $120 million expected payout from the Gacovino Book and its actual return as of 15 September 2024. (Compl. ¶¶ 2, 4, 14–15.) Teton Risk Mitigation Solutions LLC reinsured the Policies. (Compl. ¶ 17.)

8. Watts LLC alleges that in Spring 2024, Teton's manager, Don Discepolo, warned Mr. Watts that Oxford would not pay a claim under the Policies because

---

[1] The twelve Policies are identical with respect to the relevant provisions. (*See* Compl. ¶¶ 13–16.)

Oxford's parent, Accession Risk Management Group (Accession), was looking to be acquired. (Compl. ¶ 19.) Around the same time, a credit-rating agency, AM Best, announced potential financial difficulties at Oxford. (Compl. ¶ 20.) AM Best attributed the difficulties to Oxford's shift to insuring "large, financial guarantee/judgment preservation policies." (Compl. ¶ 21.)

9. On 15 July 2024, Mr. Watts met with Mr. Discepolo and executives from Oxford and Accession. (Compl. ¶ 22.) During the meeting, Oxford and Accession allegedly expressed concern about representations Watts LLC had made to obtain the Policies. (Compl. ¶ 22.) The specifics of those representations were not identified, but Mr. Watts thought it clear from the discussion that Oxford did not intend to uphold its contractual obligations. (Compl. ¶ 22.)

10. Sometime in the summer of 2024, Natalie Logan, a lawyer who worked for Accession, (Compl. ¶ 25), allegedly told Mr. Watts that Oxford would not pay "any claim that Watts LLC made and threatened to rescind the Policies altogether." (Compl. ¶ 48.)

11. As 15 September 2024 approached, Watts LLC had received only about $2 million in fees from the Gacovino Book, and Mr. Watts was readying a claim on the Policies. (Compl. ¶ 23.)

12. On 11 October 2024, Mr. Discepolo reiterated to Mr. Watts that Oxford would "just deny [any] claim [Watts filed]" because its parent company, Accession, did not want a large payout to jeopardize its potential sale. (Compl. ¶ 24 (alterations in original).)

13. Five days later, Mr. Watts again met with Mr. Discepolo, Ms. Logan, the managing director of Oxford Risk Management Group, and another representative from Accession. (Compl. ¶ 25.) Watts LLC alleges that they asked Mr. Watts to delay filing a claim so the parties could look for a third party to purchase Watts LLC's interest in the Gacovino Book instead of proceeding with the claims process. (Compl. ¶ 25 (alleging Mr. Watts "was asked to delay filing his claim . . . which Oxford 'would have to deny' ").)

14. On 19 November 2024, Mr. Discepolo sent Mr. Watts a term sheet from King Street Capital Management, LP (King Street) with a proposal to purchase Watts LLC's Gacovino Book. (Compl. ¶ 26.) However, Watts LLC alleges that Oxford refused to provide the assurances King Street required to close a deal. (Compl. ¶ 26.)

15. Watts LLC filed a claim on the Policies for approximately $118 million on 29 November 2024 (First Claim). (Compl. ¶¶ 3, 23, 27.) On 5 December 2024, Oxford informed Watts LLC that it had received the First Claim and that Oxford Risk Management would "handle the investigation and adjustment of the Claim." (Compl. ¶ 27; Compl. Ex. 5 [Claim Acknowledgement], ECF No. 3.)

16. Two weeks later, Oxford requested that Watts LLC submit documents responsive to a series of requests for information. (Compl. ¶ 28; Compl. Ex. 6 [Doc. Req. Letter], ECF No. 3.) Watts LLC alleges that the requests far exceed what the Policies allow. (Compl. ¶ 28; *see also* Doc. Req. Letter.)

17. The opening page of the Policies provides that "**THE COMPANY HAS THE RIGHT, BUT NOT THE OBLIGATION, TO INVESTIGATE CLAIMS AGAINST AN INSURED.**"[2]  (Policies 1.)

18. As part of the "Claims Process," the Policies impose "Additional Duties" on Watts LLC once it becomes aware of a "Nonpayment."  (Policies § VI.E.1.) "Nonpayment" is defined as when "[t]he aggregate Gacovino Net Proceeds collected by the **Insured** through the **Expiration Date** is less than $120,000,000."  (Policies § IV.P.)  As the insured, Watts LLC was required to

  a. preserve all files and documentation of any **Loss**;

  b. *complete any claim form(s) reasonably provided by* **Company** *and submit the complete form(s) to* **Company**, *along with documentation demonstrating evidence of payment and/or loss*; [and]

  c. afford **Company** reasonable access to the **Insured's** financial records[.]

(Policies § VI.E.1 (emphasis added).)  The same section contains this proviso:

  d. provided that any such obligation of the **Insured** hereunder shall, at all times, be subject to the **Insured's** legal and ethical obligations and the **Insured** shall *not* be required to provide to the **Company** any information that is privileged or confidential under any applicable disciplinary rules, applicable evidentiary rules or regulations.

(Policies § VI.E.1 (emphasis added).)

---

[2] The Policies refer to Oxford as "Company" and Watts LLC as "Insured."  (*See* Policies §§ IV.E, K.)

19.    The section immediately following Watts LLC's "Additional Duties" discusses "Payment" as part of the "Claims Process":

> 1.    Subject to the provisions of Section VIII.C of this **Policy** [dealing with policy cancellation], following receipt of the completed **Notice of Claim** and approved claim form(s) referenced in Section VI.E.1.b, along with the documentation described in Section VI.E.1.b *and all other information requested by* **Company**, **Company** will process one payment to the **Insured** or the **Loss Payees** pursuant to **Insured's** instructions, within ninety (90) days, pursuant to Section I of this **Policy**, *provided that the* **Insured** *has complied with all of the terms of this* **Policy**.
>
> 2.    The **Company** shall not deny a **Claim** or fail to pay a **Loss** due to the failure of **Insured** to deliver any document (x) that is privileged or confidential under any applicable disciplinary rules, applicable evidentiary rules or regulations, or (y) the delivery of which would violate any legal or ethical obligations applicable to **Insured**.

(Policies § VI.F (emphasis added).)

20.    In addition to section VI.F.1's condition precedent to payment, the "Dispute Resolution" section of the Policies conditions Watts LLC's right to sue Oxford on Watts LLC's compliance with all policy terms:

> A.    <u>Action Against Company.</u>    No person or organization, including the **Insured**, has a right under this **Policy**:
>
> . . .
>
> 2.    to sue **Company** with regard to this **Policy** unless **Insured** has complied with all the terms of the **Policy**.

(Policies § IX.A.)

21.    Watts LLC alleges that the Policies require it only "to 'complete any claim form(s)' and provide access to 'financial records . . . along with documentation

demonstrating evidence of payment and/or loss' during the claims process." (Compl. ¶ 28 (quoting Policies § VI.E.1.b–c).) Watts LLC further alleges that it was "ready to do each of those things." (Compl. ¶ 28.)

22. Although the Policies require Oxford to indemnify its insured within ninety days of receiving a claim, (Policies § VI.F.1), Oxford did not do so, (Compl. ¶ 29). Instead, Oxford attempted to negotiate a settlement with Watts LLC. (Compl. ¶ 29.) Watts LLC agreed to negotiate and rescinded the First Claim. (Compl. ¶ 30.)

23. Watts LLC alleges that, unknown to it, Oxford did not intend to negotiate in good faith. (Compl. ¶ 30.) Instead, it alleges, Oxford's goal was "to delay and obstruct the claims process." (Compl. ¶ 30.) One of the delay tactics, according to Watts LLC, involved a meeting with Jason Vanacour, who was with a company called CornerSight. (Compl. ¶ 30.) Mr. Vanacour asked Mr. Watts to rescind the First Claim to allow four months for CornerSight to do due diligence on a deal to fund its acquisition of the Gacovino Book. (Compl. ¶ 30.) During the four months that followed, however, Mr. Vanacour repeatedly told Mr. Watts that Oxford would never pay the claim, was not cooperating in the diligence process, and was not responsive to his firm's data requests, which made the deal "not feasible." (Compl. ¶ 30.)

24. Watts LLC alleges that "Oxford took these actions to minimize its liabilities, improve its AM Best rating, and maximize the acquisition prospects of its parent, Accession." (Compl. ¶ 31.)

25. During this process, at Oxford's urging, Watts LLC agreed to wait until April 2025 to re-file its claim. (Compl. ¶ 34.) But when that time came, Oxford

repeated that it would not pay Watts LLC despite its contractual obligations and instead asked Watts LLC to extend the claims deadline to 16 June 2025. (Compl. ¶ 34.)

26. Watts LLC alleges that it "continued to engage with Oxford in good faith during and after this second extension period" ending 16 June 2025. (Compl. ¶ 35.) According to Watts LLC, Oxford continued to obstruct these efforts, including by failing to cooperate with Mr. Vanacour's efforts. (Compl. ¶¶ 35–36.) It also alleges that in June 2025, Oxford's general counsel told Mr. Watts that Oxford "would not pay the claim in full." (Compl. ¶ 36.)

27. On 10 June 2025, an insurance brokerage firm announced that it would acquire Accession. (Compl. ¶ 37.)

28. On 16 June 2025, despite Oxford's representations that it would refuse to pay a claim, Watts LLC filed a second claim under the Policies (Second Claim). (Compl. ¶¶ 38, 52.) The Second Claim sought approximately $116 million rather than $118 million because by then Watts LLC had received additional proceeds from the Gacovino Book. (Compl. ¶ 38 & n.2.)

29. On 24 June 2025, Oxford's Director of Claims sent Watts LLC the same requests for information that Oxford had previously sent Watts LLC in December 2024. (Compl. ¶ 64; Doc. Req. Letter 1–3.) Again, Watts LLC takes the position that it is not required to provide the information Oxford requested, and it demands that Oxford pay the Second Claim. (Compl. ¶ 64; Watts Guerra LLC's Opp'n Def.'s Mot. Dismiss 12–16, ECF No. 21 [Pl.'s Br. Opp'n].)

## II. LEGAL STANDARD

30. A motion to dismiss under Rule 12(b)(6) probes "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016)).

31. Dismissal under Rule 12(b)(6) "is warranted when: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263 (2023) (quoting *Krawiec v. Manly*, 370 N.C. 602, 606 (2018)) (citation modified). The Court must "take the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Id.* (quoting *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 106–07 (2022)).

32. The Court also considers documents attached to the Complaint because they are "part thereof for all purposes" under Rule 10(c). *Krawiec*, 370 N.C. at 606 (quoting N.C. R. Civ. P. 10(c)). However, "[w]hen reviewing pleadings with documentary attachments on a Rule 12(b)(6) motion, the actual content of the documents controls, not the allegations contained in the pleadings." *Hale v. MacLeod*, 294 N.C. App. 318, 328 (2024) (quoting *Schlieper v. Johnson*, 195 N.C. App. 257, 263 (2009)).

## III.    ANALYSIS

33.    Watts LLC requests a declaratory judgment and asserts claims for breach of contract, bad faith, and violation of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA) arising from Oxford's handling of its two claims on the Policies.  Oxford moves to dismiss the case in its entirety.[3]

### A.    Count II: Breach of Contract Claim

34.    As a threshold matter, Oxford contends that Watts LLC has failed to satisfy a condition precedent to suit for breach of contract.  (Def.'s Mem. L. Supp. Mot. Dismiss Compl. 7–8, ECF No. 18 [Def.'s Br. Supp.].)  Specifically, Oxford maintains that the Policies clearly state that Watts LLC owes Oxford responses to the requests for information it sent after receiving each claim and that Oxford has the right to evaluate that information as part of its investigation before it can be responsible to indemnify its insured.  (Def.'s Br. Supp. 7–8, 11–13; Policies § VI.F.)  It further argues that the Policies require Watts LLC to comply with all policy terms before it can file suit against Oxford "with regard to" the Policies and that Watts LLC's refusal to respond to its requests means it has not satisfied a condition precedent to suit.  (Def.'s Br. Supp. 7–11; Policies § IX.A.2.)

35.    Watts LLC responds that Oxford breached the contract by repudiating it and that Oxford's repudiation excuses Watts LLC's obligation to comply with the prescribed conditions.  (Pl.'s Br. Opp'n 8–11.)  In any case, Watts LLC argues that it

---

[3] Counsel for Oxford represented to the Court in the hearing on this Motion that it sought dismissal of all claims without prejudice.

did comply with the preconditions to filing suit. (Pl.'s Br. Opp'n 8–9, 11–16.) Finally, Watts LLC contends that the Motion is premature because the only published cases disposing of insurance coverage disputes based on failure of a condition precedent arose at the summary judgment stage, not at the pleadings stage. (Pl.'s Br. Opp'n 10–11.)

### 1. Anticipatory Repudiation

36. The Court first considers whether the Complaint adequately alleges that Oxford engaged in the kind of unequivocal and absolute conduct that would constitute repudiation of the Policies. Watts LLC alleges that Oxford repudiated the contracts by both forecasting that it would refuse to pay a claim before any claim was made and then actually refusing to pay Watts LLC's claims once made. (Compl. ¶¶ 25, 34, 36, 50–51; Pl.'s Br. Opp'n 20–22.) Oxford argues that the statements and conduct attributable to it are insufficient to allege repudiation because the Complaint reveals that Watts LLC did not treat Oxford's statements and conduct as repudiation. (Def.'s Reply Supp. Mot. Dismiss Compl. 2–5, ECF No. 26 [Def.'s Reply Br.].)

37. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369 (2005) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)); *see also Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 260, 276 (2019) (*per curiam*). Under the theory of anticipatory repudiation, a promisee may immediately sue for breach when the promisor "renounces its duty under the agreement and declares its intention not to perform it[.]" *Messer v. Laurel Hill*

*Assocs.*, 93 N.C. App. 439, 443 (1989) (citing *Pappas v. Crist*, 223 N.C. 265, 268 (1943)).

38. Actionable anticipatory repudiation requires "words or conduct evidencing the renunciation or breach" amounting to a "positive, distinct, unequivocal, and absolute refusal to perform the contract." *Id.* (quoting *Edwards v. Proctor*, 173 N.C. 41, 44 (1917)). Moreover, such a refusal "is not a breach unless it is treated as such by the adverse party." *Profile Invs. No. 25, LLC v. Ammons E. Corp.*, 207 N.C. App. 232, 237 (2010) (citation modified) (quoting *Edwards*, 173 N.C. at 44). Therefore, a breach of contract based on anticipatory repudiation "depends not only upon the statements and actions of the allegedly repudiating party but also upon the response of the non-repudiating party." *Id.* (citing *Edwards*, 173 N.C. at 44).

39. Only the statements and conduct attributable to the parties themselves, not those of third parties, are relevant to determining whether actionable repudiation has occurred. *See Clute v. Gosney*, 290 N.C. App. 368, 372–73 (2023) (quoting *Profile Invs.*, 207 N.C. App. at 236) (considering only interactions between contract parties to analyze whether actionable repudiation occurred).

40. Here, viewing the allegations in the light most favorable to Watts LLC, the Complaint describes statements and conduct attributable to Oxford that, but for other factors, would be sufficient to plead repudiation with respect to the First Claim. For example, at paragraph 34 of the Complaint, Watts LLC alleges that "Oxford repeated that it would not pay Watts LLC despite its contractual obligation to do so."

(Compl. ¶ 34.) It alleges that Ms. Logan stated in summer 2024 that Oxford would not "pay any claim that Watts LLC made and threatened to rescind the Policies altogether." (Compl. ¶ 48.) However, other statements Watts LLC includes in its allegations do not assist it because the Complaint attributes them to persons not speaking for Oxford. (*See, e.g.*, Compl. ¶ 30 (alleging third-party statement); Pl.'s Br. Opp'n 21–22 (collecting examples of alleged third-party conduct).)

41. Regardless of whether the alleged statements and conduct of Oxford in response to Watts' First Claim were absolute and unequivocal enough to constitute repudiation, the Complaint also alleges that neither party treated those statements and conduct as a repudiation. Instead, Watts LLC pleads that both "during *and after* th[e] second extension period," which ended 16 June 2025, "Watts LLC continued to engage with Oxford in good faith." (Compl. ¶¶ 34–35 (emphasis added).) It further pleads that "[d]*espite Oxford representing that it will* [sic] *refuse to pay*, on June 16, 2025, Watts LLC filed the Second Claim for over $116 million." (Compl. ¶ 52 (emphasis added).)

42. Thus, Watts LLC alleges that it continued to pursue indemnity under the Policies after any alleged repudiation by Oxford. Watts LLC's failure to treat Oxford's alleged statements and conduct as a breach defeats its theory that actionable repudiation occurred. *See Profile Invs.*, 207 N.C. App. at 238 ("[T]he renunciation itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party. Upon such a repudiation of an executory agreement by one party the other may make his choice between the two courses open

to him, but can neither confuse them *nor take both*." (emphasis added) (quoting *Edwards*, 173 N.C. at 44)).

43. The Complaint includes one statement allegedly made by Oxford's general counsel after Watts LLC submitted its Second Claim. Watts LLC alleges that the general counsel stated "that Oxford 'would not pay the claim *in full.*' " (Compl. ¶¶ 36, 50 (emphasis added).) Because this statement, standing alone, is not an unequivocal refusal to comply with the terms of the Policies, it is insufficient to plead repudiation. *See Messer*, 93 N.C. App. at 443 (quoting *Edwards*, 173 N.C. at 44) (requiring "positive, distinct, unequivocal, and absolute refusal to perform the contract").

44. Moreover, the Complaint reveals that Oxford continued to perform its obligations under the Policies after Watts LLC presented its Second Claim. Watts LLC alleges that on 24 June 2025, Oxford re-sent Watts LLC its request for information as part of its investigation, just as it had done in December 2024, following receipt of Watts LLC's First Claim. Thus, Watts LLC's own allegations defeat its assertion that it is not required to meet the Policies' condition precedent to suit because Oxford repudiated the contract.

### 2. Conditions Precedent

45. Because it has not alleged breach by repudiation, Watts LLC bears the burden to plead that it satisfied all conditions precedent to bringing its breach of contract claim. N.C. R. Civ. P. 9(c). Watts LLC is correct that some of the cases Oxford cites on this subject arose at the summary judgment stage. (Def.'s Br. Opp'n 10–11.) However, the holdings in those cases are equally applicable at the Rule

12(b)(6) stage if "the complaint on its face reveals the absence of facts sufficient to make a good claim" or "some fact that necessarily defeats the plaintiff's claim." *Value Health Sols.*, 385 N.C. at 263 (quoting *Krawiec*, 370 N.C. at 606). Put simply, the Court must dismiss the claim for breach of contract if Watts LLC's allegations reveal the failure of a condition precedent, and whether Watts LLC has satisfied the condition turns on an interpretation of the Policies' provisions requiring Watts LLC to provide Oxford information in the claims process. (Pl.'s Br. Opp'n 12–13.)

46.    "An insurance policy is a contract, and its provisions govern the rights and duties of the parties thereto." *Radiator Specialty Co. v. Arrowood Indem. Co.*, 383 N.C. 387, 412 (2022) (citation modified) (quoting *Fid. Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380 (1986)). As is true with other contracts, the Court seeks to ascertain the intent of the parties when it construes an insurance policy. *See id.* (quoting *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield L.L.C.*, 364 N.C. 1, 9 (2010)). It enforces unambiguous contracts as written and determines their meaning as a matter of law. *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020) (citing *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970)).

47.    The fact that the parties disagree about the meaning of a policy provision is not enough. "Ambiguity is not established by the mere fact that the insured asserts an understanding of the policy that differs from that of the insurance company." *Id.* (citing *Wachovia Bank*, 276 N.C. at 354). Whether an ambiguity exists is a question for the Court. *See N. State Deli, LLC v. Cincinnati Ins. Co.*, 386 N.C.

733, 744–45 (2024) (determining whether insurance contract was ambiguous as matter of law).

48.     The canons of construction are useful for construing the language of a contract.  *See id.* at 740–41; *Wachovia Bank*, 276 N.C. at 355 (considering ambiguity doctrine "[s]ubject to . . . principles of construction"); *Woods v. Nationwide Ins. Mut. Ins. Co.*, 295 N.C. 500, 505–06 (1978) (contemplating use of canons of construction to determine whether ambiguity exists).  The canons counsel that the Court read the entire policy, harmonize its provisions, and give every word effect.  *Woods*, 295 N.C. at 506.

49.     Watts LLC argues that the principle of *ejusdem generis* applies when construing the language of the Policies.  (Pl.'s Br. Opp'n 13–16.)  Under that principle of *statutory interpretation*, not contract construction, "where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including *only things of the same kind, character and nature* as those specifically enumerated."  *N.C. Ins. Guar. Ass'n v. Century Indem. Co.*, 115 N.C. App. 175, 191 (1994) (quoting *State v. Lee*, 277 N.C. 242, 244 (1970)).

50.     The parties dispute the meaning of this policy language in section VI.F: "following receipt of the completed Notice of Claim and approved claim form(s) referenced in Section VI.E.1.b, along with the documentation described in Section VI.E.1.b and ***all other information requested by Oxford*** [sic]."  (Pl.'s Br. Opp'n 13 (quoting Policies § VI.F.1).)  Watts LLC argues the Court should read this catch-all

provision "as being carefully tailored to specific documents like the claims forms and statements of loss 'referenced' and 'described in Section VI.E.1.b[.]' " (Pl.'s Br. Opp'n 14 (quoting Policies § VI.F.1).) Oxford contends that the provision should be read broadly to encompass any information it requests. (Def.'s Br. Supp. 11–13.)

51. Contrary to Watts LLC's contention that *ejusdem generis* is "settled law" for interpreting insurance contracts in North Carolina, our Supreme Court has not endorsed its use in the manner Watts LLC espouses. *See, e.g.*, *N. State Deli*, 386 N.C. at 740–42 (omitting *ejusdem generis* from "Rules of Insurance Contract Interpretation"); *Wachovia Bank*, 276 N.C. at 354–55 (omitting *ejusdem generis* from survey of insurance contract interpretation); *see also Woods*, 295 N.C. at 505 (describing *Wachovia Bank*'s discussion of insurance contract interpretive principles as "well summarized").

52. In any event, to the extent this principle may be applied to the construction of insurance contracts, it is what it says it is: a presumption that gives way in appropriate circumstances. *See Century Indem.*, 115 N.C. App. at 191 (quoting *Lee*, 277 N.C. at 244) (describing *ejusdem generis* as a presumption). Such is the case here.

53. The Policies require compliance with their terms before Watts LLC has a right to sue "with regard to" the policies. (Policies § IX.A.2.) Section VI.E.1.b imposes a duty on Watts LLC to complete and submit Oxford's claim form in the event of "Nonpayment," (Policies § VI.E.1.b), which is defined as a shortfall in proceeds from the Gacovino Book, (Policies § IV.P). In addition, section VI.E.1.b requires Watts LLC

to provide "documentation demonstrating evidence of payment and/or loss." (Policies § VI.E.1.b.) The burden to comply with this requirement is relatively light given the Policies' narrow definition of loss as the difference between the expected and actual amount received from the Gacovino Book as of the Policies' expiration date. (Policies § IV.L.) Watts LLC's Complaint alleges facts sufficient to satisfy these requirements.

54. On the other hand, section VI.F not only repeats the requirement that Oxford submit the claim form and documentation of loss but also requires Watts LLC to produce "all other information requested by" Oxford. (Policies § VI.F.) The dispute turns on whether this catch-all provision has independent meaning.

55. As stated above, Watts LLC, applying *ejusdem generis*, argues that the answer is no. (Pl.'s Br. Opp'n 14–15.) Under its theory, "all other information requested" is a general term at the end of a list of enumerated, specific terms (i.e., the claim form and documentation of loss provisions in section VI.E.1.b). (Pl.'s Br. Opp'n 14–15.) Watts LLC maintains that the Court must read the general language (i.e., "all other information requested by" Oxford) to be of the same kind, character, and nature as the earlier, more specific language (i.e., the claim form and documentation of loss narrowly defined). (Pl.'s Br. Opp'n 12–15.) Under that interpretation, Watts LLC contends, any request for "other information" must be "carefully tailored to specific documents like the claim forms and statements of loss 'referenced' and 'described in Section VI.E.1.b.,' ***not*** the far-sweeping document requests that Oxford has served." (Pl.'s Br. Opp'n 14 (citations omitted).)

56.     But well-settled principles of contract construction foreclose Watts LLC's reading because it would render the catch-all provision superfluous. As noted above, the universe of information that the two specific duties oblige Watts LLC to produce is small. And if the universe of documents that the catch-all provision makes discoverable is null, then that term is surplusage. The canons of construction counsel against such an interpretation.

57.     Watts LLC's reading of the language would also introduce tensions between the catch-all provision and other policy provisions. First, section VI.E.1.a requires Watts LLC to preserve evidence of loss. (Policies § VI.E.1.a.) This provision would serve little or no purpose if it required Watts LLC to retain this information but provided Oxford no right to review it in the claims process.

58.     Second, section VI.E.1.d protects Watts LLC from having to disclose privileged or confidential information to Oxford. (Policies § VI.E.1.d.) Including that provision suggests that the parties anticipated producing more information than just a claims form and documentation of a loss.

59.     Third, the Policies require Watts LLC to handle the cases and collect the fees for the Gacovino Book with prescribed levels of care and effort. (Policies § II.B.1.) To read the provisions as narrowly as Watts LLC proposes would undermine Oxford's "right . . . to investigate claims" to verify Watts LLC's compliance before requiring

Oxford to make a payment.[4]  Reading the policy provisions in harmony with one another, as the canons counsel, supports a broader reading of section VI.F's catch-all provision than Watts LLC contends.

60.    Finally, it would be incongruous to permit Watts LLC to claim that "Oxford has . . . failed to adopt and implement reasonable standards for the prompt investigation of the claims" and "refused to pay claims without conducting a reasonable investigation based on the information it had in its possession," (Compl. ¶ 71), while simultaneously suggesting that Oxford has no right to investigate the validity of those claims.

61.    Instead, section VI.F.1's requirement that Watts LLC produce "all other information requested" by Oxford means that Watts LLC must produce all information that Oxford reasonably and in good faith requests in order to investigate and process Watts LLC's claim.  *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 23 (2024) ("In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985)); *see Moore v. N.C. Farm Bureau Mut. Ins. Co.*, 82 N.C. App. 616, 623–24 (1986) (reversing denial of directed verdict in favor of insurer when insured refused to comply with reasonable document requests); *cf. Chavis v. State Farm Fire*

---

[4] *See also McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 178 (D. Conn. 2005) ("It is axiomatic that an insurer has the right to investigate the validity of a claim[;] otherwise, there would be no check against fraud." (quoting *Mut. Benefit Life Ins. Co. v. Lindenman*, 911 F. Supp. 619, 629 (E.D.N.Y. 1995))).

*and Cas. Co.*, 317 N.C. 683, 687–88 (1986) (holding that reasonableness and relatedness limitations apply to fire insurer's information requests).[5]

62.     North Carolina law recognizes that an insured's proof of loss obligations may constitute conditions precedent to suit. *See Chavis*, 317 N.C. at 686 (discussing fire policy's examination and document-production requirements as "condition[s] precedent"); *Fineberg v. State Farm Fire & Cas. Co.*, 113 N.C. App. 545, 548 (1994) (holding compliance with first-party insured's duty to submit to examination under oath to be condition precedent); *Baker v. Indep. Fire Ins. Co.*, 103 N.C. App. 521, 522 (1991) (same); *Moore* 82 N.C. App. at 623–24 (same for first-party insured's duty to comply with insurer's document requests); *accord Ward v. Horace Mann Ins. Co.*, No. 07-CV-76-F, 2008 U.S. Dist. LEXIS 93743, at *16–17 (E.D.N.C. Nov. 18, 2008) ("Plaintiffs also recognize that North Carolina appellate courts repeatedly have held that the failure to submit to an examination under oath, or the failure to produce reasonably requested documents to an insurance company, bars recovery under an insurance policy."), *aff'd*, 326 F. App'x 699 (4th Cir. 2009) (*per curiam*).

63.     Watts LLC does not allege that it complied with its obligation to respond to Oxford's request for information, or even that it only refused to comply with those

_____

[5] Non-binding authority is in accord. *See* Jordan R. Plitt et al., *Couch on Insurance* § 186:8 (3d ed. 2025) ("The proof of loss requirement is designed to give the insurer facts to facilitate its investigation as opposed to notice to commence a timely investigation."); *Cent. Nat'l Ins. Co. of Omaha v. Mfrs. Acceptance Corp.*, 544 S.W. 2d 362, 364 (Tenn. 1976) ("The filing of the requisite [p]roof of loss may obviate the necessity for giving [n]otice of loss, but the giving of [n]otice of loss does not satisfy the requirement that [p]roof of loss be filed." (citations omitted)); *Siravo v. Great Am. Ins. Co.*, 122 R.I. 538, 542 (1980) ("The purpose of a proof of loss . . . is to afford the insurer an [a]dequate opportunity to protect its interests by facilitating its investigation." (citations omitted)).

requests that were unreasonably broad. Rather, Watts LLC alleges that it did not respond to Oxford's request for information at all because it does not believe that Oxford has the contractual right to ask for the information. (Pl.'s Br. Opp'n 11–16.) The Court concludes that these allegations are insufficient to plead satisfaction of the condition precedent to suit "with regard to" the Policies.

64. Oxford's Motion with respect to Count II shall therefore be **GRANTED**, and Count II shall be **DISMISSED without prejudice**.[6]

## B. Counts III and IV: Bad Faith Claims

65. Watts LLC alleges that Oxford has engaged in bad faith and unfair and deceptive trade practices with respect to its handling and refusal to pay both of Watts LLC's claims on the Policies. A bad faith claim against an insurer typically requires the plaintiff to allege "(1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct." *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 420 (1993) (citations omitted), *aff'd*, 334 N.C. 682 (1993).

66. "Bad faith means not based on honest disagreement or innocent mistake." *Id.* at 422 (citation modified) (quoting *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 396 (1985)). "Aggravated conduct may be shown by fraud, malice,

---

[6] The Court has broad discretion to decide whether its dismissal of a claim is with or without prejudice. *Orlando Residence, Ltd. v. All. Hosp. Mgmt., LLC*, 375 N.C. 140, 154 (2020) (citing *Whedon v. Whedon*, 313 N.C. 200, 213 (1985)); *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).

gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights." *Id.* (citing *Dailey*, 75 N.C. App. at 394).

67.     Even when an insurer does not breach the insurance contract because it ultimately indemnifies its insured, it can be liable in tort for engaging in bad faith during the claims handling process. *Robinson v. N.C. Farm Bureau Ins. Co.*, 86 N.C. App. 44, 49–50 (1987); Jordan R. Plitt et al., *Couch on Insurance* § 9:26 (3d ed. 2025) ("[T]here are two categories of bad faith claims:  bad faith claim handling (reckless or outrageous claim handling, such as unreasonable delays . . . apart from the actual denial of policy benefits), and a bad faith refusal to pay money[.]").

68.     In *Robinson*, our Court of Appeals held that, while alleging breach of contract alone was insufficient to support a bad faith claim, it was not necessary for a breach of contract claim to exist in order for a bad faith claim to exist.  86 N.C. App. at 49–50.  The Court concluded that the presence of "bad faith delay and aggravating conduct" was enough to support a bad faith claim even when the insurer did not deny coverage.  *Id*.  In such a case, the insured must allege that bad faith motivated the insurer's delay.  *See id*. at 45 (remanding for determination of "whether the delay in payment was in fact motivated by bad faith").

69.     Watts LLC purports to state two claims for bad faith, one with respect to each of its two insurance claims.  Assuming the truth of the allegations—as the Court must for purposes of this Motion—Watts LLC pleads that Oxford engaged in strategies designed to delay handling of Watts LLC's claims in order to make Oxford's financial condition more appealing to potential buyers.  That conduct and the

accompanying disregard of Watts LLC's rights under the Policies are sufficient to state a bad faith claim based on delay "motivated by bad faith" coupled with aggravating conduct. *See id.* at 45.

70.     The Complaint also states a bad faith claim with respect to Watts LLC's Second Claim. Watts LLC alleges that Oxford sent it an "overbroad" request for documents about a week after it filed the Second Claim. Based on its interpretation of the Policies, Watts LLC once again declined to provide the documents Oxford requested. Particularly given Oxford's alleged strategy to delay the processing of the First Claim, and giving Watts LLC the benefit of reasonable inferences with respect to this Motion, the Court declines to conclude at this early stage that Watts LLC's allegations fail to state a bad faith claim.[7]

71.     The Court shall therefore **DENY** the Motion on Counts III and IV.

**C.     Counts V and VI: UDTPA Claims**

72.     Watts LLC's fifth and sixth claims are for violations of the UDTPA. (Compl. ¶¶ 67–81; Pl.'s Br. Opp'n 31–38.) The UDTPA makes "unfair and deceptive acts or practices in or affecting commerce . . . unlawful." N.C.G.S. § 75-1.1(a) (2026). "Whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court." *Gray v. N.C. Ins. Underwriting Ass'n*, 352

---

[7] It would be illogical to preclude a bad faith claim because Watts LLC failed to provide reasonably requested documentation (the condition precedent) when the bad faith alleged is, at least in part, that Oxford's requests were overbroad and, therefore, unreasonable. *See* Ronald J. Clark, Diane K. Dailey & Linda M. Bolduan, 3 *Law and Practice of Insurance Coverage Litigation* § 28:34 (2025) ("Payment under a first-party policy is predicated upon the insured carrying out the conditions of the contract. However, an insured's noncompliance generally is held not to provide a defense to a bad faith action." (footnotes omitted)).

N.C. 61, 68 (2000) (citation modified) (citing *Ellis v. N. Star Co.*, 326 N.C. 219, 226 (1990)).

73.     The elements of a claim for unfair and deceptive trade practices are that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Value Health*, 385 N.C. at 277 (quoting *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426 (2020)); *see also* N.C.G.S. § 75-1.1.  "Unfairness or deception . . . in the circumstances of [a contract's] breach may establish the existence of substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim." *Value Health*, 385 N.C. at 277 (quoting *SciGrip*, 373 N.C. at 426). However, a mere breach of contract alone is insufficient to support a claim for unfair or deceptive trade practices.  *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88 (2013) (citing *Mitchell v. Linville*, 148 N.C. App. 71, 74 (2001)).

74.     "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  *Id.* at 91 (quoting *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72 (2007)).  "A practice is deceptive if it has the capacity or tendency to deceive."  *Id.* (citation modified) (quoting *Walker*, 362 N.C. at 72).  A UDTPA plaintiff must show that he suffered "actual harm."  *Jackson v. Home Depot U.S.A., Inc.*, 388 N.C. 109, 120 (2025) (emphasis omitted).

75. Violations of some North Carolina statutes constitute *per se* violations of the UDTPA.[8] *See* Noel Allen, *North Carolina Unfair Business Practice* § 1.03 n.22 (3d ed. 2025) (listing statutes). Other statutes expressly provide that failure to comply does not amount to a violation of the UDTPA. *See, e.g.*, N.C.G.S. § 42-14.4(c) ("Failure to comply with this section shall not constitute an unfair trade practice under G.S. 75-1.1.").

76. The North Carolina Insurance Unfair Trade Practices Act, N.C.G.S. §§ 58-63-1 to -75, specifies conduct that constitutes "an unfair or deceptive act or practice in the business of insurance." N.C.G.S. § 58-63-10. Section 58-63-15(11) lists actionable "unfair claim settlement practices." N.C.G.S. § 58-63-15(11). Prohibited conduct includes (1) "failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;" (2) "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;" (3) "refusing to pay claims without conducting a reasonable investigation based upon all available information;" (4) "failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;" and (5) "not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear[.]" N.C.G.S. § 58-63-15(11)(b)–(f) (citation modified).

---

[8] *See generally* Matthew W. Sawchak, *Refining Per Se Unfair Trade Practices*, 92 N.C. L. Rev. 1881 (2014).

77.     But section 58-63-15(11) does not apply here for two reasons.  First, section 58-63-15(11) does not create a private cause of action.  N.C.G.S. § 58-63-15(11) ("[N]o violation of this subsection shall of itself create any cause of action in favor of any person other than the Commissioner [of Insurance].");  *see Gray*, 352 N.C. at 70–71 (discussing inapplicability of section 58-63-15(11) to private parties seeking to sue for discrete violations of that statute).  Second, a violation of this provision occurs only when the enumerated acts occur "with such frequency as to indicate a general business practice[.]"  N.C.G.S. § 58-63-15(11).  There is no such allegation here.

78.     Despite the statutory hurdles in chapter 58, violations of some of section 58-63-15(11)'s listed unfair acts may support a private cause of action under chapter 75.  *Gray*, 352 N.C. at 73–74.  In *Gray*, our Supreme Court affirmed a jury verdict for unfair claims settlement practices in favor of a private plaintiff based on isolated violations of section 58-63-15(11).  *Id.*  It held that an insurer responsible for an enumerated act under section 58-63-15(11) "commit[s] a violation of [chapter 75] separate and apart from any violation of [section] 58-63-15(11)."  *Id.* at 73.  Further, the fact that the insured in *Gray* was a private plaintiff who failed to prove that the insurer–defendant acted "with such frequency as to constitute a general business practice" was not a bar to recovery under chapter 75.  *Id.* at 73–74.  The Court concluded that section 58-63-15(11)'s list of wrongs provides "examples of conduct to support a finding of unfair or deceptive acts or practices."  *Id.* at 71;  *see also* Matthew W. Sawchak, *Refining Per Se Unfair Trade Practices*, 92 N.C. L. Rev. 1881, 1902–05 (2014).

79. Here, the parties disagree about whether and how section 58-63-15(11) applies to Oxford. Watts LLC argues that *Gray* permits it to state a UDTPA claim under chapter 75 by alleging isolated instances of conduct that section 58-63-15(11) prohibits. (Pl.'s Br. Opp'n 32–38.) Oxford responds that violations of section 58-63-15(11) cannot support a UDTPA claim under chapter 75 because the Captive Insurance Act excludes Oxford from regulation under chapter 58, including for acts listed in section 58-63-15(11). (Def.'s Br. Supp. 16–17; Def.'s Reply Br. 11–12; N.C.G.S. § 58-10-465(a)).

80. Oxford's argument that it is not subject to the Insurance Unfair Trade Practices Act is true, but unavailing. The defendant–insurer's conduct in *Gray* did not fall within the ambit of section 58-63-15(11) either. Nevertheless, the Supreme Court held that chapter 75 independently imposed liability "because [the conduct listed in section 58-63-15(11)(f)] is *inherently* unfair, unscrupulous, immoral, and injurious to consumers." *Gray*, 352 N.C. at 71 (emphasis added).

81. Given the holding in *Gray*, this Court concludes that Watts LLC has stated claims under chapter 75 for conduct that is also included in section 58-63-15(11). The Court shall therefore **DENY** the Motion as to Counts V and VI.

## D. Count I: Declaratory Judgment

82. The Declaratory Judgment Act authorizes the Court "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed[,]" N.C.G.S. § 1-253, "in any proceedings . . . in which a judgment or decree will terminate the controversy or remove an uncertainty[,]" N.C.G.S. § 1-256. The Act specifically authorizes the Court to declare rights and obligations under a

contract, whether before or after a breach. N.C.G.S. § 1-254. The Act's purpose "is to settle and to afford relief from uncertainty and insecurity . . . and it is to be liberally construed and administered." N.C.G.S. § 1-264.

83. Dismissal under Rule 12(b)(6) is "seldom . . . appropriate . . . in actions for declaratory judgments[.]" *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974). The Court dismisses "only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy." *Id.* (citations omitted). Further, "the mere existence of an alternate adequate remedy will not be held to bar an appropriate action for declaratory judgment." *State ex rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357 n.3 (1980) (citing N.C. R. Civ. P. 57).

84. Watts LLC seeks a declaration of its rights and obligations under the Policies. (Compl. ¶ 42.) It asks the Court to declare that

a. As of the Expiration Date of the Policies, Nonpayment had occurred[;]

b. Due to the Nonpayment, Oxford was required to pay Watts LLC the "amount of Loss arising from Nonpayment"[;]

c. Oxford knew that Watts LLC stated a valid claim pursuant to the Policies[;]

d. Oxford engaged in bad faith conduct by intentionally delaying and obstructing the claims process[;]

e. Oxford's conduct constituted an unfair and deceptive trade practice[;] [and]

f. As of June 16, 2025, the Loss totals at least $116,317,578.34.

(Compl. ¶ 42.)

85. The Court concludes for the same reasons that require dismissal of Watts LLC's breach of contract claim that its request for declarations a–c and f is not properly pled. But Watts LLC's request for declarations d and e, in which it asks the Court to declare that Oxford engaged in bad faith conduct by intentionally delaying and obstructing the claims process and that Oxford engaged in an unfair and deceptive trade practice, is based on an existing controversy and is properly pled. The Court shall therefore **DENY** the Motion with respect to the request for declaratory judgment.

## IV. CONCLUSION

86. **WHEREFORE**, the Court **GRANTS in part** and **DENIES in part** the Motion as follows:

   a. For Count I seeking declaratory judgment, the Court **DENIES** the Motion;

   b. For Count II alleging breach of contract, the Court **GRANTS** the Motion and **DISMISSES** the claim **WITHOUT PREJUDICE**;

   c. For Counts III and IV alleging bad faith with respect to the two insurance claims, the Court **DENIES** the Motion;

   d. For Counts V and VI alleging violations of the UDTPA with respect to the two insurance claims, the Court **DENIES** the Motion.

**SO ORDERED**, this the 3rd day of March 2026.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases